UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
ADRIENNE MARSH LEFKOWITZ,
                                    :
                 Plaintiff,              REPORT & RECOMMENDATION
                                    :
        -against-                        01 Civ. 6252 (VM)(MHD)
                                    :
THE BANK OF NEW YORK, and THE
BANK OF NEW YORK AS EXECUTOR        :
OF THE ESTATES OF NICHOLAS AND
IRENE MARSH, and McCARTHY,          :
FINGAR, DONOVAN, DRAZEN &
SMITH, and FRANK STRENG, ESQ., :

                 Defendants.  :
------------------------------x

TO THE HONORABLE VICTOR MARRERO, U.S.D.J.:


        This action arises out of the long-running administration of

the estates of Nicholas Marsh (deceased March 15, 1988) and Irene

Marsh (deceased May 13, 1990) in New York and Westchester counties

and in Hong Kong. Pro se plaintiff Adrienne Marsh Lefkowitz, a

lawyer, is one of three daughters of the deceased, and beneficiary

of a thirty-percent interest in both estates. In this federal

action, she has sued the sole executor of the two estates, the Bank

of New York ("BNY" or "the bank"); the law firm representing BNY in

the estate proceedings, McCarthy, Fingar, Donovan, Drazen & Smith,

L.L.P. ("MFDDS" or "the law firm"); and the MFDDS partner in charge

of the Marsh estate proceedings, Frank Streng, Esq. In her amended

1

complaint, Ms. Lefkowitz alleged that defendants' actions in administering the Marsh estates amounted to criminal activity in violation the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and also triggered other forms of civil liability to her. Thus she claimed that defendants had breached their fiduciary duties to her, and had engaged in conversion, fraud and other similar violations of state law. In all, Ms. Lefkowitz asserted two RICO claims (Counts I and II), a claim for relief for deceptive practices under the consumer protection law New York General Business Law § 349 (Count III), claims for fiduciary breach and aiding and abetting fiduciary breach (Counts IV and V), conversion (Count VI), fraudulent misrepresentation and fraudulent concealment (Counts VII and VIII), unjust enrichment (Count IX), and a congeries of claims (Counts X to XII) that seek, respectively, payment of money allegedly owed to her, specific performance of certain Hong Kong consent orders, and declaratory relief confirming her entitlement to certain estate assets. In seeking this relief in federal court despite the pendency of the two estate proceedings and other related state-court suits brought by plaintiff, she says that she is attempting "to resolve claims and damages and determination of her rights for which no comprehensive and effective relief is available in Surrogate's Court." (Pl.'s Am. Compl. dated Aug. 27, 2001, 1).

2

As for the factual allegations, to summarize briefly, Ms. Lefkowitz presents the bases for her complaint under seven subheadings. In the order presented, these allegations are: (1) that BNY improperly paid MFDDS inflated and/or fraudulent legal bills for services rendered from August 1990 through 1999 (id. at ¶¶ 25-44); (2) that signatures of Irene Marsh appearing on various documents affecting Ms. Lefkowitz's interest in the personal property and estate assets of her mother are forgeries (id. at ¶¶ 45-51); (3) that BNY has refused to marshal or distribute to her certain items of personal property from her parents' estates, and that BNY "diverted" from her approximately $1 million in distributions from the two estates and placed them in two bank accounts, which she cannot access (id. at ¶¶ 52-84); (4) that BNY violated the terms of five Hong Kong consent orders settling costs levied against her by the Hong Kong courts (id. at ¶¶ 85-94); (5) that BNY improperly indemnified and failed to marshal assets from a Hong Kong citizen who had held assets as a trustee for Nicholas Marsh, that BNY concealed from plaintiff information regarding salaries owed to her from several family-owned Hong Kong companies, and that BNY improperly paid inflated legal bills to the Hong Kong solicitors representing the estates (id. at ¶¶ 95-113); (6) that the New York County Surrogate, Eve Preminger, had incorrectly surcharged plaintiff for loans that she had made while managing her

3

father's assets during her tenure as executrix (id. at ¶¶ 114-40);
and (7) that BNY has refused to pay her legal fees and repay her
expenditures for her work on behalf of the Nicholas Marsh and Irene
Marsh estates. (Id. at ¶¶ 141-52).


Prior Proceedings in This Case


Some years ago defendants moved to dismiss or stay the action.
In doing so, they asserted four general grounds in support of their
motion: (1) that this court lacks subject-matter jurisdiction over
the action; (2) that Ms. Lefkowitz's complaint fails to state a
cause of action under RICO, the New York General Business Law § 349
and the common law; (3) that the action is barred by the doctrines
of res judicata and collateral estoppel; and (4) that this court
should abstain from hearing the action while the Marsh estates
remain in probate. (Affidavit in Supp. of Mot. To Dismiss of Robert
M. Redis, Esq., sworn to Apr. 10, 2008, 3). Upon our recommendation
(Report and Recommendation dated Sept. 2, 2003), the District Court
granted the motion based on (1) plaintiff's failure to plead viable
RICO claims or a claim under the General Business Law and (2) the
application of the probate exception to diversity jurisdiction to
the balance of her claims. Lefkowitz v. Bank of New York, 2003 WL
22480049 (S.D.N.Y. Oct. 31, 2003).

4

Plaintiff pursued an appeal from that decision, although she abandoned the two RICO claims and the General Business Law claim, and therefore ended up seeking reversal with respect to only the nine common-law claims. After an extended pause, in 2007 the Second Circuit affirmed in part and reversed in part, based on the Supreme Court's issuance in 2006 of a decision clarifying and limiting the scope of the probate exception. Lefkowitz v. Bank of New York, 528 F.3d 102, 105-08 (2d Cir. 2007) (discussing and applying Marshall v. Marshall, 547 U.S. 293 (2006)). Specifically, the Circuit Court affirmed the dismissal of Counts VI and IX through XII of Lefkowitz's Amended Complaint, while reversing and remanding for further proceedings Counts IV, V, VII and VIII -- the fiduciary-breach and fraud counts. Id. at 105.

On remand, defendants have noted that in their prior motion they had pressed other theories for dismissal that this court had not found it necessary to address, and they have renewed their motion to dismiss on a host of grounds. In both pursuing and opposing this motion, the parties have freshly briefed the issues. Moreover, plaintiff has moved (1) for judgment on the pleadings on at least one count (Count VII) and possibly two others (Counts IV and V), (2) for leave to amend the complaint, and (3) for an order striking portions of defendants' papers in support of their

5

dismissal motion.

For the reasons that follow, we deny plaintiff's motion to strike and to amend, and recommend that the District Court grant defendants' motion to dismiss and deny plaintiff's motion for judgment on the pleadings. Finally, we recommend that if the complaint is dismissed, the court should <u>sua</u> <u>sponte</u> enter an injunction precluding plaintiff from filing additional federal lawsuits concerning her parents' estates without prior court permission.

<u>The Motions</u>

In defendants' current dismissal motion, they first argue, pursuant to Rules 12(b)(6), 12(c) and 9(b), that plaintiff fails to plead adequately claims for breach of fiduciary duty, aiding and abetting a fiduciary breach, fraudulent misrepresentation and fraudulent concealment. Moreover, they suggest that some of her fiduciary-breach claims are time-barred. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss, 4-17). Second, they assert that some or all of plaintiff's surviving claims should be barred by the principles of res judicata or collateral estoppel, since those claims or their underlying facts were previously and fully

litigated in the various Surrogate's Court proceedings and possibly in other state-court cases filed by plaintiff. (Id. at 18-20). Third, they argue that this court should abstain from addressing any otherwise surviving claims under the Younger and Colorado River versions of the abstention doctrine. (Id. at 20-24). Fourth, they assert that this court should abstain from deciding the fraudulent-misrepresentation claim (Count VII) as a matter of comity since that claim concerns orders entered by the Hong Kong courts in a related estate proceeding over which those courts have continuing jurisdiction. (Id. at 24-25).

In plaintiff's response, she characterizes defendants' motion as, in substance, one for summary judgment. So treated, she first argues, the motion should be denied since motions for judgment on the pleadings under Rule 12(c) -- which is how defendants label their motion -- are limited to inadequacies on the face of the targeted complaint, whereas defendants rely on evidence proffered in their attorneys' affidavits. (Pl.'s Mem. of Law in Opp'n to Def.'s 2008 Mot. to Dismiss, 1-2). She also argues that this motion is a repeat of the original dismissal motion from 2002 and should be rejected on that basis alone. (Id. at 3-4). She then proceeds to argue that the surviving claims are, as found by the Second Circuit, within this court's jurisdiction. and that this court

should therefore adjudicate their merits. (Id. at 4-6). She next argues that neither abstention nor the principle of comity bars adjudication of her four remaining claims. (Id. at 6-11). In the following sections of her memorandum, she addresses the remaining arguments of the defendants on their motion, contending that her claims are not barred by res judicata or collateral estoppel, that the Rule 9(b) requirement of particularized pleading does not apply to fiduciary-breach claims not based on fraud, that her claims are not untimely, and that they are properly pleaded. (Id. at 11-22). Finally, in brief and conclusory terms she argues that dismissal would be inappropriate because discovery was not completed before it was stayed in 2002. (Id. at 22). She also seeks leave to amend her complaint in unspecified respects (apparently including the attachment to her current complaint of certain documents that she appends to her memorandum of law), and judgment on the pleadings as to liability on the fraudulent misrepresentation claim (Count VII) and possibly also on her fiduciary-breach claims (Counts IV and V). (Id. at 23).

     Following defendants' filing of reply papers in support of their dismissal motion, plaintiff filed a motion to strike portions of those papers. She premises this demand principally on her contention that the reply papers -- notably an affidavit by Robert

8

M. Redis, Esq. and parts of the defendants' reply memorandum of law -- proffer information that is not properly considered on a motion that is addressed to the face of the complaint. She also argues that defendants' reply is improper because it raises new issues rather than simply addressing the substance of plaintiff's opposition papers, and objects to the submission of a previously filed affidavit by defendant Frank Streng, Esq., because he is not admitted to the federal bar. (Pl.'s Mem. in Supp. of Mot. to Strike, 1-3; Affidavit of Adrienne M. Lefkowitz in Supp. of Mot. To Strike, sworn to Sept. 21, 2008, ¶¶ 2-19). Not surprisingly, defendants have opposed this motion as totally meritless.

<u>Proceedings in the Various Estate Cases</u>

In our prior Report and Recommendation, we summarized the highlights of the tortuous history of the three estate proceedings in which Ms. Marsh, her siblings and the defendants here have been embroiled since 1988. We reiterate and update that history here, since it is pertinent to various of defendants' asserted grounds for their current motion.[1] Although our account may not be

_____

[1] Although some of this history is not reflected in the body of plaintiff's amended complaint, we may take judicial notice of filings and decisions in cases pending in this and other courts, many of which are proffered in defendants' papers and in a pair

exhaustive, it captures the highlights of this extended history of litigative conflict.

In undertaking this summary, we note that much of that history is reflected in the exhibits annexed to the 2002 affidavit of Mr. Streng submitted by defendants in support of their original motion to dismiss and resubmitted in connection with the current application, as well as in a more recent affidavit by trial counsel Robert M. Redis, Esq. Those affidavits are a target of plaintiff's motion to strike, an application that we deny. To the extent that the affidavits provide documentation of other court proceedings, they are properly considered, since we may take judicial notice of those proceedings. <u>See</u>, <u>e.g.</u>, <u>Anderson v. Rochester-Genesee Reg'l Transp. Auth.</u>, 337 F.3d 201, 205 n.4 (2d Cir. 2003); <u>Conopco, Inc. v. Roll Int'l</u>, 231 F.3d 82, 86-87 (2d Cir. 2000). In any event we rely upon those affidavits only to the extent that they offer such information.[2]

_____

of more recent submissions by the plaintiff. (<u>See</u> Affidavit of Frank W. Streng, Esq., sworn to March 12, 2002, at ¶¶ 14-57 & Exs. 2-21; Redis Aff. in Supp. of Mot. To Dismiss, Ex. G; Affidavit in Further Support of Robert M. Redis, Esq., sworn to Sept. 11, 2008, Ex. A; Pl.'s "Post Appeal Status Report", dated March 18, 2008; Pl.'s Sept. 15, 2009 letter to the Court).

[2] We note that plaintiff herself has submitted two sets of documents after briefing of the motion, in which she updates the state of play in the probate proceedings and includes a series of

1. <u>Surrogate's Court Litigation over the Nicholas Marsh Estate</u>

Nicholas Marsh died on March 15, 1988. Ms. Lefkowitz was named as the sole executor of his estate in his will, and was granted preliminary letters testamentary to administer the estate in April 1988. (Streng Aff., Ex. 6 -- Report of Referee David Rudenstine, dated Dec. 1, 1995 ("Rudenstine Rep. I"), 2). However, plaintiff's temporary letters were suspended in March 1990 and, following a hearing, revoked in April 1990. Plaintiff was also barred from serving as permanent executrix of the estate, a decision later upheld on appeal. <u>In re Estate of Marsh</u>, 173 A.D.2d 336, 336, 575 N.Y.S.2d 284, 284 (1st Dep't 1991), <u>appeal dismissed</u> 78 N.Y.2d 990, 575 N.Y.S.2d 272, <u>mot. for lv. to appeal denied</u>, 79 N.Y.2d 751, 579 N.Y.S.2d 561 (1991). Plaintiff's removal was the result of her improvidence while acting as preliminary executor, including extending unsecured loans of $1.5 million to two unfunded family companies; ignoring court orders to pay her mother specified sums from a trust in the father's estate to cover medical bills; her failure to timely file estate tax returns; her failure to file certain income tax returns;  her failure to marshal and administer

---

recent decisions by the Westchester County Surrogate. (<u>See</u> Pl.'s Post Appeal Status Report; Pl.'s Sept. 15, 2009 letter to the Court). We rely on these submissions in the same fashion as we consider the equivalent submissions of Messrs. Streng and Redis.

estate assets insofar as she refused to submit paperwork necessary to commence an ancillary probate proceeding in Hong Kong; her failure to report on those proceedings; her refusal to sign a document that she herself had drafted that resolved a variety of estate issues with the beneficiaries; and her efforts to appropriate to herself certain pension plan funds, which Surrogate Marie Lambert labeled as "the most serious evidence of self-interested dealing and conflict of interest." See id. at 336-37, 575 N.Y.S.2d at 284-85; In re Estate of Marsh, 202 A.D.2d 367, 368, 610 N.Y.S.2d 6, 7 (1st Dep't 1994); Rudenstine Rep. I at 113.[3] As summarized by Surrogate Lambert, Ms. Lekowitz's "hostility, acts of improvidence and clear conflict of interest with the beneficiaries of the estate" made her ineligible to serve as a fiduciary." (Rudenstine Rep. I at 113). In her decision prohibiting plaintiff from serving as executor, the Surrogate directed plaintiff to file an accounting for the time she served as preliminary executrix. In re Estate of Marsh, 173 A.D. at 336, 575 N.Y.S.2d at 284. The Surrogate also appointed BNY -- which was listed as an alternate executor in Nicholas Marsh's will -- as permanent executor and

---

[3] Plaintiff later moved to vacate the Surrogate's decision removing her as executor, on the basis of fraud and newly-discovered evidence. Plaintiff's motion was denied, and the denial unanimously upheld on appeal. In re Estate of Marsh, 202 A.D.2d at 367, 610 N.Y.S.2d at 7.

trustee, a move similarly upheld on appeal. Id.

In August 1990 BNY moved for appointment as executor of the estate and to admit the will to probate, but plaintiff objected and sought to disqualify BNY from serving as executor. Plaintiff also objected to BNY's hiring of MFDDS as counsel to the bank in its administration of the estate. Will of Marsh, 179 A.D.2d 578, 579, 578 N.Y.S.2d 911, 912-13 (1st Dep't 1992). The Surrogate granted BNY preliminary letters testamentary and scheduled a hearing on plaintiff's objections to the appointment of BNY and MFDDS. Id. at 579, 578 N.Y.S.2d at 912. However, the Appellate Division later determined that no hearing was required, as plaintiff's objections to the appointments of BNY and MFDDS were baseless, and the Appellate Division had already affirmed the Surrogate's prior order designating BNY as executor of the estate. Id. at 579-81, 578 N.Y.S.2d at 913-14. Therefore, BNY became permanent executor of plaintiff's father's estate in February 1992 and his will was admitted to probate. (Streng Aff. ¶ 14 n. 4 at p. 9). The Appellate Division also affirmed the Surrogate's denial of plaintiff's motion to disqualify MFDDS. Will of Marsh, 179 A.D.2d 581, 582, 579 N.Y.S.2d 64, 65 (1st Dep't 1992).

Meanwhile, in December 1990 Ms. Lefkowitz filed the accounting

13

for the brief period that she served as preliminary executrix of her father's estate, as ordered by the Surrogate. (See Rudenstine Rep. I at 2). BNY objected to Ms. Lefkowitz's accounting, and, following extensive discovery, the parties proceeded to a trial before Referee David Rudenstine on May 11, 1994. (Id. at 2-3). After 48 days of testimony, the trial ended on January 3, 1995. (Id. at 3-4). Referee Rudenstine issued a 145-page recommendation on December 1, 1995, which Surrogate Preminger confirmed in large part and rejected in smaller part by decision dated July 29, 1997. (See Streng Aff., Exs. 6 & 7). Both decisions were highly critical of Ms. Lefkowitz's conduct in the management of the estate and in subsequent litigation. The courts surcharged her personally more than $1.6 million (inclusive of interest), directed her to pay $250,000.00 in attorneys' fees out of her share of the estate, and denied most of her requests for compensation. (See id. ¶ 17 & Ex. 7 at 1-10; Am. Compl. at ¶¶ 136-37). Ms. Lefkowitz's appeals of the disposition of her accounting have been uniformly rejected. See In re Estate of Marsh, 265 A.D.2d 253, 254, 697 N.Y.S.2d 25, 26 (1st Dep't 1999), mot. for leave to appeal denied, 95 N.Y.2d 755, 712 N.Y.S.2d 447 (2000), appeal dismissed, 95 N.Y.2d 956, 722 N.Y.S.2d 469 (2000), cert. denied, 532 U.S. 1038 (2001).

In April 1992, Ms. Lefkowitz filed another application to

14

revoke BNY's letters in the <u>Nicholas Marsh</u> proceeding. (<u>See</u> Am. Compl. at ¶ 16; Streng Aff. at ¶¶ 15-16 & Ex. 5). That petition, which repeated Ms. Lefkowitz's previous attack on the appointment of the bank, was denied by Surrogate Eve Preminger, who thereafter imposed sanctions on plaintiff for the frivolous nature of her application, an award that Ms. Lefkowitz appealed and that the Appellate Division affirmed. <u>See</u> <u>In re Estate of Marsh</u>, 207 A.D.2d 749, 616 N.Y.S.2d 962 (1st Dep't 1994). <u>See also</u> <u>In re Estate of Nicholas Marsh</u>, File No. 1980/88, Order dated Aug. 14, 2002, 2.[4]

In April 1995, while awaiting Referee Rudenstine's decision regarding Ms. Lefkowitz's accounting, BNY made an interim distribution of $4 million to various beneficiaries of Nicholas Marsh's estate. (<u>See</u> Streng Aff., Ex. 10 -- Order dated Oct. 5, 1995, 1). In doing so, the bank withheld a $1.2 million distribution to Ms. Lefkowitz as a set-off for any surcharges that may have resulted from the then-pending proceedings. (<u>Id.</u>). Ms. Lefkowitz moved to compel distribution to her of the $1.2 million, and Surrogate Preminger granted her application. (<u>Id.</u> at 1-2). In so doing, however, the Surrogate acknowledged that BNY may have

---

[4] As noted in our September 2, 2003 R&R, we received a copy of this decision directly from Surrogate Preminger's chambers. It was reported in the New York Law Journal August 20, 2009, at 18, col. 4.

15

been entitled to an offset, but noted that Ms. Lefkowitz's share in the balance of the estate, including assets being dealt with in an ancillary probate proceeding in Hong Kong, was enough to cover any possible surcharge. (Id. at 2).

By order dated February 21, 1995, Surrogate Preminger ordered BNY to file its final accounting by June 1, 1995. (See Streng Aff., Ex. 8 -- Report of Referee David Rudenstine, dated Nov. 22, 1998 ("Rudenstine Rep. II") at 3). Because of outstanding matters in the ancillary estate proceedings, however, BNY was not able to submit a final accounting to the Surrogate's Court by the appointed deadline. (Id. at 3-4).

However, BNY did file an interim accounting for the Nicholas Marsh estate for the period ending May 26, 1995. (Id. at 4). Ms. Lefkowitz submitted extensive objections to BNY's accounting, and once again the accounting of the estate was tried before Referee Rudenstine. (Id.). Before the trial began on June 12, 1997, BNY submitted a supplemental accounting for the period from May 26, 1995 until July 31, 1996. (Id. at 4-5). After hearing 30 days of testimony and reviewing the extensive documentation submitted by the parties, Referee Rudenstine issued a 160-page recommendation on November 22, 1998, largely rejecting plaintiff's objections to the

bank's accounting. (Id. at 1-160). The recommendation did accept plaintiff's objection to Nicholas Marsh's estate having been charged attorneys' fees related to the ancillary Hong Kong proceeding, and directed MFDDS to re-submit its attorney fee request with the Hong Kong-related expenses segregated, except for its request for fees in connection with the sale of one of the family-owned businesses, which the referee determined the estate should pay. (Id. at 155). Following this submission, on September 15, 1999, Referee Rudenstine issued another recommendation regarding MFDDS's application for fees charged apart from those connected with the Hong Kong proceeding -- an application to which plaintiff had also objected. (Streng Aff., Ex. 9 -- Report of Referee David Rudenstine, dated Sept. 15, 1999 ("Rudenstine Rep. III")). Again, the Referee rejected virtually all of plaintiff's objections. (See id. at 23).

On August 14, 2002, Surrogate Preminger confirmed both of Referee Rudenstine's reports regarding BNY's accounting and attorney's fees with minor modifications. In re Estate of Nicholas Marsh, Aug. 14, 2002 Order at 2-3. The result was that BNY's interim accounting was almost entirely vindicated, as was its payment of legal fees to MFDDS for matters other than the ancillary Hong Kong proceeding. In the same decision, the Surrogate also

denied yet another motion by Ms. Lefkowitz to remove BNY as the executor of Nicholas Marsh's estate -- a motion that Ms. Lefkowitz had filed during the pendency of BNY's accounting proceedings, grounded in the same objections as she had raised to BNY's accounting. (Id. at 2).

On January 22, 1998, Ms. Lefkowitz moved to compel the distribution to her of approximately $1.1 million from the Nicholas Marsh estate. (See Streng Aff., Ex. 11 -- Report and Affidavit of Referee David Rudenstine, dated April 8, 1998 ("Rudenstine Rep. IV") at 2). The Referee recommended that Ms. Lefkowitz's application be denied in light of the very substantial surcharges that she still owed the estate from her accounting. (Id. at 9-10) (noting Ms. Lefkowitz's liability to the estate "may range between $1,242,582 to $3.1 million"). Surrogate Preminger confirmed the report with minor modifications on June 8, 1999. (Streng Aff., Ex. 11).

In 2002 BNY distributed to plaintiff the remaining funds in the estate sub-accounts. (Pl.'s Post Appeal Status Report at p. 4). In 2006 BNY filed its final accounting for the Nicholas Marsh estate. (Id.). Plaintiff has contested that accounting, including, once again, fees payable to MFDDS. The decision whether to approve

18

that accounting is still awaited, with a conference before the Surrogate having been held on November 18, 2009 and further proceedings anticipated to resolve the matter. (See Pl.'s Sept. 15, 2009 letter to the Court).

## 2. Surrogate's Court Litigation over the Irene Marsh Estate

Irene Marsh died on May 13, 1990. By the terms of a codicil to Ms. Marsh's will, BNY was appointed as preliminary executor of the estate, a step that Ms. Lefkowitz vigorously but unsuccessfully resisted, and thus the bank was issued preliminary letters testamentary by the Surrogate's Court, Westchester County. (See Streng Aff., Ex. 2). In August 1992, Ms. Lefkowitz filed a petition to revoke BNY's preliminary letters. (See id., Ex. 3). Her petition charged that BNY had been appointed based on "misrepresentations of material fact", and that it was wasting estate resources and engaging in other acts of misconduct and dishonesty. (Id. at ¶ 5). This application was denied by Surrogate Albert Emanuelli in a decision dated December 21, 1992 (id., Ex. 2), and the Surrogate's decision was affirmed following plaintiff's appeal. See Matter of Marsh, 212 A.D.2d 792, 792, 624 N.Y.S.2d 860, 860 (2d Dep't 1995)(affirming Surrogate's order).

19

Ms. Lefkowitz also objected to the probate of the codicil to her mother's will, which named BNY as executor. A jury trial was held on the question of Ms. Marsh's capacity to execute the codicil, and the jury found that the codicil had been validly executed. That result was then affirmed when plaintiff appealed from the adverse trial result. See Matter of Marsh, 236 A.D.2d 404, 405, 653 N.Y.S.2d 624, 625 (2d Dep't 1997) (affirming verdict and Surrogate's refusal to set aside verdict). Ms. Marsh's will and codicil were admitted to probate by the Surrogate's Court on December 22, 1995 and BNY was granted letters testamentary as executor. See id. at 405, 653 N.Y.S.2d at 625.

Apart from the controversy over the status of the executor, the estate of Irene Marsh has proceeded through probate in Westchester County. On April 10, 1991, BNY, having been appointed preliminary executor, commenced a proceeding under New York Surrogate Court Procedure Act ("SCPA") § 2103 to identify assets belonging to the Irene Marsh estate, and to determine ownership of certain items of tangible personal property that were the subject of an alleged gift by Mrs. Marsh to plaintiff's two sisters. (See Streng Aff. at ¶ 31 & Ex. 13). Ms. Lefkowitz was a party to that proceeding. (See id.). These controversies and other issues then being litigated in the Nicholas Marsh estate proceeding apparently

20

delayed the processing of this estate.

BNY filed an accounting in the Irene Marsh estate in August 2004 covering the period from May 13, 1990 through April 30, 2004, to which plaintiff filed objections. In re Lefkowitz, 13 Misc.3d 1231(A), 2006 WL 3069296, * 1 (Sur. Ct. Westchester County 2006); (Pl.'s Sept. 15, 2009 letter -- attaching In re Estate of Irene B. Marsh, Decision after Trial dated Apr. 16, 2009, 1). In light of BNY's filing, plaintiff sought distribution of certain funds not subject to withholding by BNY on account of its pending applications to assess legal fees and costs against the plaintiff in related proceedings. In re Lefkowitz, 2006 WL 3069296, at * 1. On September 28, 2006 Westchester County Surrogate Anthony A. Scarpino, Jr., issued a decision addressing the potential distribution of those funds to Ms. Lefkowitz, ordering that the funds not be distributed without prior court order because the estate had only limited assets at that point. Id. at * 4.

As a separate matter, by decision dated December 21, 2007 Surrogate Scarpino adjudicated in plaintiff's favor her contention that her mother's assignment of certain personal property to plaintiff's siblings had violated a 1983 will contract between Mr. and Mrs. Marsh concerning distribution of the property, but he

rejected Ms. Lefkowitz's request for summary judgment to the effect
that her sisters had converted the property. (Pl.'s Post Appeal
Status Report -- annexing In re Estate of Irene B. Marsh, Decision
& Order dated Dec. 21, 2007, 13-14).

BNY supplemented its accounting to cover the period from May
1, 2004 through March 31, 2006, and plaintiff objected to that
filing as well. (Pl.'s Sept. 15, 2009 letter -- attaching In re
Estate of Irene B. Marsh, Apr. 16, 2009 Decision at 1). By decision
dated February 1, 2008, Surrogate Scarpino dismissed as a matter of
law several of plaintiff's objections to BNY's original and
supplemental accounting. (Pl.'s Post Appeal Status Report --
annexing In re Estate of Irene B. Marsh, Decision & Order dated
Feb. 1, 2008, 16-17).

Finally, a trial on plaintiff's remaining objections to those
accountings was held in 2008. In its wake, the Surrogate issued
three decisions. The first, dated April 16, 2009, addressed
plaintiff's many objections to the accountings, accepting some but
rejecting the majority. (Pl.'s Sept. 15, 2009 letter -- attaching
In re Estate of Irene B. Marsh, Apr. 16, 2009 Decision). To the
extent that plaintiff prevailed concerning BNY's handling of the
decedent's tangible property that had been taken by plaintiff's

22

sisters, the court ordered BNY to pay Ms. Lefkowitz compensatory damages and interest totaling $274,855.00, less the value of tangible property distributed to plaintiff or sold by BNY. (Id. at 13-23). Surrogate Scarpino, however, rejected plaintiff's conversion claims against her two sisters, holding that those claims were beyond his jurisdiction. (Id. at 43). As for plaintiff's complaint about estate distributions that BNY had made to a sub-account rather than paying Ms. Lefkowitz, the Surrogate found that these withholdings from her in anticipation of her owing additional sums to the estate were unwarranted, and he therefore ordered the bank to pay her interest for the period of withholding at nine percent per annum. (Id. at 23-28). Surrogate Scarpino also addressed all of plaintiff's complaints about attorney's fees payable to MFDDS, rejecting most but ordering a small amount returned to the estate. (Id. at 28-40). The Surrogate also accepted some of plaintiff's objections to BNY's commissions and reduced the commissions slightly. (Id. at 41-42).

On June 5, 2009 the Surrogate issued an amendment to his prior decision in one minor respect, concerning interest payable by BNY. (Id. -- attaching Estate of Irene B. Marsh, Amended Decision After Trial, dated June 5, 2009). On August 28, 2009 he issued a further decision, in response to motions for reconsideration by both BNY

and MFDDS and by plaintiff, both motions targeting the awards to plaintiff based on the disposition of personal tangible property by her sisters and BNY's distributions to the sub-account. In that amended decision he modified in certain respects his measurement of the amount of damages and interest that BNY was to pay to plaintiff. (Id. -- attaching In re Estate of Irene B. Marsh, Decision & Order dated Aug. 28, 2009, 8).

### 3. Hong Kong Litigation

Nicholas and Irene Marsh had assets in Hong Kong. After the appointment of BNY in New York as preliminary fiduciary in both estates, BNY engaged solicitors in Hong Kong -- Dianne Brennan and Gordon D. Oldham of the firm Oldham, Li & Nie -- to administer the decendents' Hong Kong estates. (Streng Aff. at ¶ 36). Ms. Lefkowitz, who was separately represented by other Hong Kong solicitors, contested the ancillary probate proceedings in Hong Kong, and even filed a separate suit there against BNY and Li Ka-Shing, the Hong Kong business associate of her deceased father, but the court rejected her challenge in 1996. (See Am. Compl. at ¶ 17; Streng Aff. at ¶¶ 37-38; Lefkowitz v. Li Ka-Shing, 04-103122, Am. Verified Compl. at ¶¶ 31-34 (Sup. Ct. N.Y. County.)). Following the English custom, the Hong Kong court imposed costs on plaintiff as

24

the losing party in the litigation. (See Am. Compl. at ¶ 85). Ms. Lefkowitz had numerous cost orders assessed against her, and she eventually agreed to pay the Hong Kong estates approximately US $900,000.00 to settle these orders. (See Streng Aff. at ¶ 37; Am. Compl. at ¶¶ 87-89).

On November 29, 1999, the Hong Kong court issued a series of "consent orders" that detailed the terms of the settlement agreement as to the cost issue. (See Am. Compl. at ¶¶ 87-89 & orders annexed as Ex. B). In broad outline, BNY agreed to make distributions from Ms. Lefkowitz's share of the U.S. estates of Nicholas and Irene Marsh sufficient to satisfy Ms. Lefkowitz's liability to the Hong Kong estates for the US $900,000.00 in costs. (See Streng Aff. at ¶ 41). According to plaintiff, the orders specified that the parties had agreed that approximately 93% of Ms. Lefkowitz's liability was to be paid out of her share in her father's estate, and that the remaining 7% was to come from her interest in her mother's estate. (See Am. Compl. at ¶ 89 & Ex. B).

On or about February 1, 2000, BNY settled Ms. Lefkowitz's cost surcharge to the Hong Kong estates by charging her debt against her distributions from the two estates. In doing so, plaintiff claims, it did not adhere to the proportions from the Nicholas and Irene

Marsh estates that had been specified in the settlement agreement with plaintiff. (See Am. Compl. at ¶ 93).

Plaintiff, a party to the Hong Kong probate proceeding, threatened to contest the accounting of the Marshes' Hong Kong estates (Streng Aff. at ¶¶ 38-39; Am. Compl. at ¶ 113), but apparently never formally did. The accounting for those estates in Hong Kong was approved in December 2003. (Pl.'s Sept. 15, 2009 letter -- attaching In re Estate of Irene B. Marsh, Apr. 16, 2009 Decision at 4; Lefkowitz v. Li Ka-Shing, Am. Verified Compl. at ¶ 27).

### 4. Related State-Court Litigation by Plaintiff

Plaintiff has filed a host of other lawsuits in New York state court, almost all of which seek to relitigate issues that she raised in the various probate proceedings and lost. Not surprisingly, the courts have uniformly rejected these claims, principally on grounds of res judicata and untimeliness.

In May 1992 plaintiff filed suit in New York State Supreme Court, Westchester County, naming as defendants two companies, known as Joseph Markovits, Inc. ("JMI") and Floral Masquerade,

Inc., both of which had been owned by her family until their sale by BNY as executor. Lefkowitz v. Joseph Markovits, Inc., Index No. 010875/92. By this lawsuit she sought compensation for claimed salary and reimbursement for asserted expenses for a period when she had borne responsibility for the management of JMI after her father had become ill in 1985. This claim represented a reiteration of a claim for salary and expense compensation for the period of June 1986 until January 31, 1990 that she had previously asserted in her accounting for the Nicholas Marsh estate in the New York County probate proceeding.

The bank initially intervened in the Westchester lawsuit for the purpose of obtaining a stay because plaintiff had placed the same issues before the Surrogate's Court. The presiding Supreme Court justice (the Hon. Nicholas Colabella), granted the requested stay, and during its pendency the Referee and Surrogate in the Nicholas Marsh probate proceeding rejected Ms. Lefkowitz's parallel claim for salary and expense compensation. (Rudenstine Report I at 25-35, & Streng Aff., Ex. 7 at 6-7. See Lefkowitz v. JMI, No. 2000-01086, Respt's' Br., 2000 WL 34455661, *10-12). The Appellate Division affirmed that decision in 1999, and then denied plaintiff's motion for reargument. (Lefkowitz v. JMI, Respt's' Br., 2000 WL 34455661, at *12). See In re Estate of Nicholas Marsh, 265

A.D.2d at 254, 697 N.Y.S.2d at 26. The Court of Appeals then also denied plaintiff's application for leave to appeal to the Court of Appeals. In re Marsh, 95 N.Y.2d 755, 712 N.Y.S.2d 447 (2000).

In 1999, BNY sought to intervene as a party defendant in plaintiff's pending Supreme Court lawsuit, just as plaintiff was seeking a trial. Plaintiff opposed intervention and sought to disqualify MFDDS as counsel. The presiding justice, the Hon. John P. DiBlasi, granted intervention and, in response to the defendants' motion, dismissed the lawsuit on res judicata grounds. He also denied plaintiff's motion to disqualify MFDDS. (Lefkowitz v. JMI, Respt's' Br., 2000 WL 34455661, at *12-13). Plaintiff appealed, and the Appellate Division affirmed, holding that plaintiff's claims were barred by res judicata. Lefkowitz v. Joseph Markovits, Inc., 279 A.D.2d 456, 719 N.Y.S.2d 585 (2d Dep't 2001).

On February 13, 1995, Ms. Lefkowitz commenced a separate suit against BNY, as executor of Irene Marsh's estate, in Supreme Court, Westchester County. Lefkowitz v. Bank of New York, Index No. 581/95. (See Streng Aff. at ¶ 32 & Ex. 14). In that action, Ms. Lefkowitz complained about the bank's actions with regard to the same items of personal property -- removed by her siblings from her mother's home -- that were subject to the pending SCPA § 2103

proceeding in probate court. (<u>See</u> <u>id.</u>). BNY has answered the
complaint, and the record before us seems to indicate that the
action is still pending in Supreme Court, apparently because
plaintiff has taken no actions to pursue it. (<u>Id.</u>)

On November 1, 1996, Ms. Lefkowitz commenced another lawsuit
in Westchester County Supreme Court, this time against her sisters,
her sisters' attorneys, MFDDS and Frank Streng. Lefkowitz v.
Appelbaum, Index No. 04857/96. (<u>See</u> Streng Aff., Ex. 17). In her
complaint, which asserted nine claims of fraud and violations of
N.Y. Jud. Law § 487(1), Ms. Lefkowitz alleged that defendants had
conspired to defraud her of her share of the family businesses
(including JMI), that BNY had sold JMI for the estate for a
fraction of what it was worth, and that defendants had made
numerous misrepresentations to the New York County Surrogate,
causing Ms. Lefkowitz to suffer substantial financial damages. (<u>See</u>
<u>id.</u>, Ex. 17 at ¶¶ 17-34 & Ex. 18 -- Decision and Order dated Sept.
24, 1997, pp. 2, 5-8).

The trial court entered summary judgment dismissing all of
plaintiff's claims on September 24, 1997. (<u>See</u> <u>id.</u>, Ex. 18 at 3-
23). Justice DiBlasi found that eight of Ms. Lefkowitz's claims
were time-barred (<u>id.</u> at 3-15, 18-21), and that the only timely

cause of action, one for fraud, failed to state a claim. (Id. at
15-18). Ms. Lefkowitz appealed the statute-of-limitations rulings
to the Appellate Division and lost. See Lefkowitz v. Appelbaum, 258
A.D.2d 563, 563, 685 N.Y.S.2d 460, 461 (2d Dep't 1999).

On April 24, 1998, Ms. Lefkowitz commenced another lawsuit
against Frank Streng, Robert Redis and MFDDS in Westchester County
Supreme Court. Lefkowitz v. Streng, Index No. 19646/97. (See Streng
Aff., Ex. 19).[5] In that action, Ms. Lefkowitz asserted eight claims
against the attorneys, all under N.Y. Jud. Law § 487(1), and
alleged that members of the MFDDS firm had made numerous false or
fraudulent representations to the New York County Surrogate's
Court. (See id. at ¶¶ 83, 84, 89, 91, 96, 98, 101, 109, 113, 116,
120, 124, 134, 142). The defendants answered, and the action is
apparently still pending. (Streng Aff. at ¶ 53).

In May 2000, Ms. Lefkowitz once more sued BNY (as executor of
her parents' estates) and her sisters in Westchester County Supreme
Court. Lefkowitz v. Bank of New York, Index No. 00/05515. (See
Streng Aff. at ¶ 55 & Ex. 20). In this suit, Ms. Lefkowitz pressed

_____

[5] The complaint is dated April 24, 1998, but the case bears a
1997 index number. The record before us does not clarify this
inconsistency.

30

claims for lost salary, for an alleged ransacking of her office, and for unjust enrichment. (See id., Ex. 20 at ¶¶ 20, 67-74 & Ex. 21 -- Decision and Order dated Jan. 5, 2001, p. 2). All of these claims were subsequently dismissed by Justice Louis A. Barone as barred by res judicata, time-barred, or not legally sufficient as pled. (See id., Ex. 21 at pp. 2-6).

In 2004 plaintiff filed suit in the New York State Supreme Court, New York County, against BNY and Mr. Li Ka-Shing, her late father's Hong Kong business associate. Lefkowitz v. Li Ka-Shing, Index No. 04-103122. She asserted claims that Li had withheld assets from the Hong Kong probate proceeding that had belonged to her father; that BNY had failed to marshal and account for property belonging to her father's estate; and that BNY, in collusion with Li, had breached its fiduciary obligations to her. (Lefkowitz v. Li Ka-Shing, Am. Verified Compl. at ¶¶ 26-55). The trial judge, Hon. Charles E. Ramos, dismissed all of plaintiff's claims on a variety of grounds, including statute of limitations, the res judicata effects of various orders of the Hong Kong courts and lack of standing. See Lefkowitz v. Li Ka-Shing, Order Resettling Orders filed Oct. 28, 2005 at 4-5. He also imposed sanctions of $10,000.00 on plaintiff. Id. at 5. Finally, he enjoined plaintiff from commencing any more proceedings against BNY, Mr. Li Ka-Shing or her

31

parents' estates except through proper probate proceedings brought
by the estates in Surrogate's Court, unless she first obtained
permission from the State Supreme Court, the Surrogate's Court or
the Hong Kong courts. Id. at 6. On appeal, the First Department
affirmed, and the Court of Appeals declined to review the case.
Lefkowitz v. Li Ka-Shing, 30 A.D.3d 334, 334, 819 N.Y.S.2d 494, 495
(1st Dep't), appeal dismissed, 7 N.Y.3d 864, 824 N.Y.S.2d 608
(2006).

     In addition to this litany of related state-court litigation
instituted by Ms. Lefkowitz, we note, but do not further discuss,
a series of lawsuits brought by plaintiff against a number of law
firms that she apparently had retained at various times in
connection with estate matters. In most of the suits, she sought to
blame the firms for her mis-steps as executrix of her father's
estate or assert claims of breach of fiduciary duty or malpractice.
See Lefkowitz v. Etra & Etra, 13 A.D.3d 132, 787 N.Y.S.2d 5 (1st
Dep't 2004)[6]; Lefkowitz v. Kaye, Scholer, Fierman, Hays & Handler,
271 A.D.2d 576, 706 N.Y.S.2d 176 (1st Dep't 2000); Lefkowitz v.
Schulte, Roth & Zabel, 279 A.D.2d 457, 718 N.Y.S.2d 859 (1st

--------

     [6] It should be mentioned that plaintiff filed two lawsuits
against Etra & Etra, counsel for the Nicholas Marsh estate when
plaintiff was the initial executor. (Lefkowitz v. Etra & Etra,
No. 2001-4867, Def.-Resp't's Br., 2003 WL 25576321, *4-6).

Dep't), motion for leave to appeal denied, 96 N.Y.2d 719, 733 N.Y.S.2d 371 (2001). See also Lefkowitz v. Preminger, 261 A.D.2d 447, 690 N.Y.S.2d 105 (2d Dep't 1999); Shaw, Licitra, Bohner, Esernio, Schwartz & Pfluger, P.C. v. Lefkowitz, 2002 WL 1969237 (N.Y. Dist. Ct. Aug. 15, 2002) (attorneys retained to assist plaintiff in Lefkowitz v. Applebaum, 04857/96, seeking unpaid fees). We also do not address a federal lawsuit that plaintiff filed, apparently originally in state court, under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1), which was an outgrowth of another dispute about her entitlement to family assets.[7]

ANALYSIS

We turn first to defendants' motion to dismiss or stay plaintiff's remaining claims. We then briefly address plaintiff's

---

[7] Ms. Lefkowitz pursued that action, which was filed in state court and removed to this court, to assert a claim to her father's pension, which her mother also claimed. Although plaintiff was unsuccessful in that lawsuit, no one has argued that it was so groundless as to suggest frivolity or improper motivation. See In re Lefkowitz, 767 F. Supp. 501 (S.D.N.Y. 1991), aff'd sub nom. Lefkowitz v. Arcadia Trading Co. Ltd. Ben. Pension Plan, 996 F.2d 600 (2d Cir. 1993).

motion to amend and for partial judgment on the pleadings.[8] Finally, we sua sponte consider the appropriateness of joining with the state courts in imposing on plaintiff certain restrictions if she seeks to engage in further estate-related litigation in this court.

I. The Adequacy of the Complaint under Rule 12(c)

Since defendants' motion is premised, in part, on the contention that the complaint fails adequately to plead the remaining claims, we first briefly summarize the applicable legal standards and then turn to an assessment of the pleading. We then address the remaining grounds on which defendants seek dismissal.

---

[8] At this point we reiterate our previously noted denial of plaintiff's motion to strike a portion of defendants' motion papers. Insofar as she attacks the two attorney affidavits, we have already observed that their account of the prior litigation history of plaintiff with regard to her parents' estates is pertinent and  competent, including their identification of litigation documents, of which we may take judicial notice. As for defendants' reply memorandum, we see nothing improper in it. Finally, contrary to plaintiff's argument, Mr. Streng's affidavit may be considered on the current motion irrespective of whether he is a member of the bar of this court.

A. <u>Rule 12(b)(6) & 9(b) Standards</u>

We start by noting the standards that the movant must meet in order to obtain dismissal for failure to state a claim.[9] "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982); <u>accord</u>, <u>e.g.</u>, <u>Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 476 (2d Cir. 2006). In assessing such a motion, the court must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. <u>See</u>, <u>e.g.</u>, <u>Achtman v. Kirby, McInerney & Squire, LLP</u>, 464 F.3d 328, 337 (2d Cir. 2006); <u>Still v. DeBuono</u>, 101 F.3d 888, 891 (2d Cir. 1996).

The traditional test on a Rule 12(b)(6) motion required that the complaint not be dismissed unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his

_____

[9] As noted in our prior R&R, since plaintiff moves for dismissal after having filed an answer to the complaint, its motion invokes Rule 12(c), for which the applicable standards are identical to those under Rule 12(b)(6). <u>Johnson v. Rowley</u>, 569 F.3d 40, 43 (2d Cir. 2009) (citing <u>Morris v. Schroder Capital Mgmt. Int'l</u>, 445 F.3d 525, 529 (2d Cir. 2006)); <u>In re Ades & Berg Group Investors</u>, 550 F.3d 240, 243 n.4 (2d Cir. 2008) (citing <u>Burnette v. Carothers</u>, 192 F.3d 52, 56 (2d Cir. 1999)).

claim which would entitle him to relief.'" Leibowitz v. Cornell
Univ., 445 F.3d 586, 590 (2d Cir. 2006)(quoting Conley v. Gibson,
355 U.S. 41, 45-46 (1957)). The Supreme Court has recently rejected
this formulation, however, and hence a complaint is now subject to
dismissal unless its factual allegations, if credited, make the
claim "plausible". See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949
(2009); Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 560-61
(2007). The court thus must look first to the well-pled factual
allegations, determine whether they are plausible, and then
determine whether those plausible allegations, if proven, suffice
to establish liability. See, e.g., Iqbal, 129 S.Ct. at 1949-50.
Twombly does not impose "a universal standard of heightened fact
pleading, but . . . instead requir[es] a flexible 'plausibility
standard', which obliges a pleader to amplify a claim with some
factual allegations in those contexts where such amplification is
needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d
143, 157-58 (2d Cir. 2007), rev'd on other grounds sub. nom.
Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009)(emphasis in original). In
short, the pleading must "'raise a right to relief above the
speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund Ltd., 493
F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 555).

When addressing a Rule 12(b)(6) motion, the court may not

36

consider evidence proffered by the moving party or its opponent. Rather, the court is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. See, e.g., id. at 98; Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Leonard F. v. Israel Disc. Bank, 199 F.3d 99, 107 (2d Cir. 1999). Judicial notice may encompass the status of other lawsuits, including in other courts, and the substance of papers filed in those actions. See, e.g., Anderson, 337 F.3d at 205 n.4; Conopco, Inc., 231 F.3d at 86-87; Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1388 (2d Cir. 1992) (court can take judicial notice of document filed in another court "to establish the fact of such litigation and related filings" (quoting Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)); Sure-Snap Corp. v. State St. Bank and Trust Co., 948 F.2d 869, 872 (2d Cir. 1991) (taking judicial notice of bankruptcy court findings to determine their preclusive effect); Dewees v. Legal Servicing, LLC, 506 F. Supp. 2d 128, 130-31 (E.D.N.Y. 2007) (taking judicial notice of New York City Civil Court judgment).

    As for the requirements of Rule 9(b), it imposes a more

stringent pleading regime than does Rule 8 on certain types of claims. Pertinent to the defendants' pending motion, it requires, for all fraud allegations, that the pleader must "state with particularity the circumstances constituting fraud". To comply with this requirement, "'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 290 (2d Cir. 2006) (quoting <u>Mills v. Polar Molercular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993)). Moreover, although "[m]alice, intent, knowledge, and other conditions of a person's mind may be averred generally", Fed. R. Civ. P. 9(b), if the claim is one for fraud the pleader must nonetheless "'allege facts that give rise to a strong inference of fraudulent intent.'" <u>Lerner</u>, 459 F.3d at 290 (quoting <u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d 47, 52 (2d Cir. 1995)).

B. <u>The Pleading Adequacy of Plaintiff's Claims</u>

1. <u>The Fiduciary Breach Claim (Count IV)</u>

_____

Plaintiff asserts her fiduciary-breach claim solely against BNY. (Am. Compl. ¶¶ 178-83). Apart from invoking wholesale all of

the preceding 177 paragraphs of the complaint, she states that "BNY repeatedly breached its fiduciary duties to the estate and plaintiff by the acts set forth above" -- referring to the lengthy summary of the history of the estate proceedings found in paragraphs 8 to 166 -- and then lists thirteen categories of alleged wrongdoing, as follows:

> 1) conversion of plaintiff's distributions
>
> 2) delaying the administration of the estate
>
> 3) refusing to account
>
> 4) refusing to marshal property
>
> 5) acting with conflict of interest
>
> 6) violations of law as set forth above
>
> 7) violations of court orders
>
> 8) violations of agreements
>
> 9) overpayments of professional bills of MFDDS and Oldham Li & Nie and failure to seek repayments
>
> 10) refusing to provide information to plaintiff about the estate(s) to which she us entitled
>
> 11) concealing BNY's wrongdoing knowingly and with intent to deceive
>
> 12) not keeping accurate records or account "ledgers"
>
> 13) delegating its duties to Frank Streng

(Am. Compl. ¶ 181). Plaintiff goes on to assert in conclusory

fashion that she was injured as a result of this alleged wrongdoing, and she seeks compensatory and punitive damages. (Id. at ¶¶ 182-83).

Because of the vast array of factual allegations found in both the historical summary in the complaint (paragraphs 8-152) and in the extensive allegations of wrongdoing in the now-dismissed RICO claims (paragraphs 160(a)-(p)), a reader cannot readily discern from the cited and unadorned list of thirteen categories of alleged fiduciary breaches in paragraph 181 what specific conduct by defendants is said to underpin each of these conclusory allegations. In an effort to remedy this defect, plaintiff offers in her opposition memorandum a list of paragraph numbers keyed to each of the subparagraphs found in paragraph 181. (Pl.'s Mem. In Opp'n at 20). We rely on plaintiff's specifications in assessing the viability of Count IV.

Since plaintiff characterizes this set of claims as amounting to an assertion that BNY breached its fiduciary duties to her, we briefly note the elements of such a claim. These include allegations of "(1) the existence of a fiduciary duty between the parties; (2) the breach of that duty; and (3) damages suffered as aa result of the breach." People ex rel. Spitzer v. H.R. Block,

<u>Inc.</u>, 16 Misc.3d 1124(A), 847 N.Y.S. 2d 903, 2007 WL 2330924, *7 (Sup. Ct. N.Y. County 2007). <u>Accord</u> <u>SCS Commc'ns, Inc. v. Herrick Co.</u>, 360 F.3d 329, 342 (2d Cir. 2004) (citing <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u>, 974 F.2d 270, 281-82 (2d Cir. 1992)). Moreover, to the extent that the fiduciary-breach allegations rest on assertions of fraudulent conduct by the fiduciary, plaintiff must adequately plead the required elements for a claim of fraud, which includes "(1) a false representation (2) of a material fact with (3) intent to defraud and (4) reasonable reliance on the representation (5) causing damage to the plaintiff." <u>People ex rel. Spitzer</u>, 2007 WL 2330924, at * 7 (citing <u>Stuart Silver Assocs. v. Baco Dev. Corp.</u>, 245 A.D.2d 96, 98, 665 N.Y.S.2d 415, 417 (1st Dep't 1997)). <u>See</u>, <u>e.g.</u>, <u>New York Univ. v. Continental Ins. Co.</u>, 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 289 (1995); <u>City of New York v. Smokes-Spirits.com, Inc.</u>, 541 F.3d 425, 454 (2d Cir. 2008).


We proceed to apply these standards to each category of fiduciary breach alleged by plaintiff.


    1) "conversion of plaintiff's distributions" (Am. Compl. ¶¶
    59-79, 85-94, 136-40)


The allegations pertinent to this version of the fiduciary-

breach claim refer principally to a series of distributions between 1995 and 2001 from both the Nicholas Marsh and the Irene Marsh estates. Plaintiff alleges that BNY, as executor, withheld portions of her share of these distributions -- in at least one case with notice to her -- and placed them in one or more BNY accounts to which she had no access. (Am. Compl. ¶¶ 59-79). The claim also encompasses an accusation by plaintiff that, in violation of a settlement agreement between her and the estates that was embodied in a series of Hong Kong consent orders, BNY debited more of the plaintiff's share of the Irene Marsh estate than had been agreed to (and less of her share of the Nicholas Marsh estate) to satisfy Ms. Lefkowitz's obligation to pay the estates US $900,000.00 in costs, and that the bank improperly used some of the funds that she asserts should have been distributed to her previously to pay a portion of this debt on her behalf. (Id. at ¶¶ 85-94). Finally, as part of the same "conversion" variant of the fiduciary-breach claim, plaintiff complains of rulings by the Surrogate's Court referee and judge in 1995 and 1998; specifically, she seeks to challenge rulings that surcharged for certain loans that she had authorized to JMI, which was owned by her family and which she controlled for a time starting in 1985 and ending in January 1990. (Id. at ¶¶ 136-40).

42

Plaintiff's allegations pertaining to the bank's withholding of distributions to her from the two estates do not meet the requirements for pleading a fiduciary breach based on an accusation of conversion. Under New York law, "'conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting Vigilant Ins. Co. of Am. v. Hous. Auth., 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 347 (1995)). To state a claim of conversion, the plaintiff must allege that "(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another[,] (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." Seanto Exps. v. United Arab Agencies, 137 F. Supp. 2d 445, 451 (S.D.N.Y. 2001). Moreover, if the property is money, "it must be specifically identifiable and subject to an obligation to be returned or otherwise treated in a particular manner." Fleurentin v. McDowell, 2009 WL 2969686, *7 (E.D.N.Y. Sept. 16, 2009) (citing Republic of Haiti v. Duvalier, 211 A.D.2d 379, 626 N.Y.S.2d 472 (1st Dep't 1995)).

Plaintiff does allege a failure by BNY to make certain distributions to her, but does not allege facts suggesting that BNY

exercised ownership or dominion over the funds or that it did so without authority. The very court proceedings and decisions to which plaintiff herself refers demonstrate that the bank was withholding estate distributions because of obligations that Ms. Lefkowitz owed to the estates or that the bank anticipated she might owe.  In short, the moneys in question were set aside to satisfy obligations of plaintiff to the estates and were not being claimed by the bank. Moreover, these withholdings were subject to review and approval by the probate courts and hence were not being held without authorization even though in one case the court determined that BNY should release a sum that it had withheld because the estate then still held sufficient funds that would otherwise go to Ms. Lefkowitz to cover any pre-existing surcharges or other debts of hers. Furthermore, in view of the fact that the probate courts had final decision-making authority over these payments and non-payments and repeatedly exercised that authority, plaintiff cannot plausibly allege (and in fact does not even try to do so) that the purported misconduct by the bank caused her injury,[10] an omission that is also fatal to her claim for fiduciary

---

[10] We note that according to documents appended to plaintiff's amended complaint, the funds withheld from her and placed in segregated accounts earned income through investment in money market funds and United States Treasury bills. (Am. Compl., Ex. A pp. 1, 4). Moreover, plaintiff was awarded interest when she prevailed on her objection to BNY's withholding of her

breach. <u>See</u>, <u>e.g.</u>, <u>Nordwind v. Rowland</u>, 584 F.3d 420, 2009 WL
3320493, * 9 (2d Cir. Oct. 16, 2009) (plaintiff must show proximate
injury to sustain fiduciary-breach claim for damages).

Equally amiss are plaintiff's allegations concerning the
payment of moneys from her parents' estates to satisfy her own
obligations to those estates pursuant to a set of cost orders in
the Hong Kong proceedings. These allegations also do not remotely
suggest a misappropriation by the bank of funds belonging to
plaintiff; at most, they concern the application of plaintiff's
anticipated share of estate funds to pay her cost debt to the
estates.[11] Finally, insofar as plaintiff complains of rulings by the
Surrogate's Court surcharging her, these allegations do not support

---

distributions from her parents' estates. (Rudenstine Rep. II at
67-68 (awarding plaintiff three percent interest on funds
withheld from distributions from father's estate); Pl.'s Sept.
15, 2009 letter -- attaching <u>In re Estate of Irene B. Marsh</u>, Apr.
16, 2009 Decision at 27-28 (awarding plaintiff nine percent
interest on funds withheld from distributions from mother's
estate)). <u>But</u> <u>see</u> <u>In re Estate of Nicholas Marsh</u>, 1980/88, Aug.
14, 2002 Order at 3 (rejecting Referee's award of interest for
withholding of distribution from plaintiff's father's estate).

[11] In addition, as we noted in the prior R&R, the allegation
that BNY did not adhere to the agreed-upon split of 93 percent
from the Frank Marsh estate and 7 percent from the Irene Marsh
estate does not indicate any factual basis for plaintiff to
assert that she was injured since the total payment of US
$900,000.00 from funds otherwise designated as moneys to be
distributed to her did not change from what the consent orders
had stipulated. (<u>See</u> R&R at p. 30).

a conversion-based fiduciary-breach claim, which must be premised on a showing of an unauthorized seizure by BNY of property owned by plaintiff.

Wholly apart from these defects, plaintiff's allegations concerning conduct by BNY that occurred more than three years before the filing of her original complaint, on July 11, 2001, are time-barred.[12] For example, she refers to an alleged seizure of money by BNY on October 7, 1997. (Am. Compl. ¶ 72). The pertinent statute of limitations for claims of breach of fiduciary duty based on non-fraudulent tortious conduct is three years under CPLR § 214(3) for cases in which the plaintiff, as here, seeks damages. See Sporn v. MCA Records, Inc., 58 N.Y.2d 482, 488, 462 N.Y.S.2d 413, 416 (1983); Kaufman v. Cohen, 307 A.D.2d 113, 118, 760 N.Y.S.2d 157, 164 (1st Dep't 2003); 770 Owners Corp. v. Spitzer, 25 Misc.3d 1204(A), 2009 WL 3018733, *10 (Sup. Ct. Kings County Sept.

---

[12] Plaintiff filed her original complaint on July 11, 2001 and amended it soon after, on August 28, 2001. Under the Federal Rules, if an amended complaint pleads a claim or defense that is based on the same "conduct, transaction or occurrence" described in the original complaint, the amended complaint relates back to the date of the original for purposes of applying the statute of limitations. Fed. R. Civ. P. 15(c)(1)(B). We operate on the premise that all of plaintiff's claims in her amended complaint are transactionally related to her original complaint. Therefore, although we discuss plaintiff's claims as pled in her amended complaint, we use the date she filed her original complaint for statute of limitations purposes.

46

21, 2009); <u>Balta v. Ayco Co.</u>, 626 F. Supp. 2d 347, 356 (W.D.N.Y. 2009).[13] Hence all claimed diversions predating August 1998[14] -- including the allocation of debits to plaintiff's shares of her parents' estates -- are beyond the statute of limitations.

_____

[13] Plaintiff has not been consistent in identifying which of the many versions of her fiduciary-breach claim are based on a theory of fraud. In resisting defendants' invocation of Rule 9(b), she seems to say, or at least imply, that her claim in its various guises is not fraud-based. (Pl.'s Mem. at 20). In responding to the limitations argument, she could be interpreted as arguing to the contrary. (<u>Id.</u> at 17-18). This only underscores the patent inadequacy of her lengthy pleading, but in any event we notice that she explicitly labels one of her fiduciary-claim theories as fraud-based (<u>see</u> Am. Compl. ¶ 181(11)), and we rely therefore on her wording to identify which allegations involve accusations of negligence or incompetence and which are premised on a claim of outright dishonesty.

[14] Plaintiff seeks to avoid the statute of limitations barring activity that occurred prior to 1998 by characterizing defendants' various distributions to the segregated accounts as "multiple conversions" for which the statute of limitations only begins running on the date of the last conversion. (Pl.'s Mem. at 18, citing <u>Stanley v. Morgan Guar. Trust Co.</u>, 173 A.D.2d 390, 570 N.Y.S.2d 22 (1st Dep't 1991)). However, each distribution from plaintiff's parents' estates, and corresponding withholding of plaintiff's share in a segregated account, was plainly a discrete transaction, such that plaintiff's reliance on the <u>Stanley</u> case addressing repeated conversions of the same property is misplaced.

Similarly, plaintiff's argument that the statute of limitations only begins to run on a conversion claim against a fiduciary when the beneficiary learns of facts to support the claim does not advance her cause. Plaintiff admits that she knew of the facts underlying her conversion claims at the time of the 1995 and 1997 withholdings, which underlie her current claims. (Am. Compl. ¶¶ 67, 71-72).

2) "delaying the administration of the estate" (Am. Compl. ¶¶ 8, 9, 13, 14, 17, 19, 84, 86, 113, 145)

Plaintiff points to a handful of allegations that in various respects BNY did not act as quickly as she wished, either in marshaling assets of the estates, or in filing an accounting in the various estate proceedings, or in agreeing with her to settle the estates' claim of costs against her in the Hong Kong proceeding. These allegations fail to state a fiduciary-breach claim.

The repeated legal proceedings that plaintiff initiated in multiple courts -- some of which she pleads or otherwise places before us and all of which we can take judicial notice of -- and the extended hearings and court decisions necessitated by her tidal wave of objections to virtually everything that BNY did as executor demonstrate that any contention by her that BNY violated its duties to her because it allegedly negligently or otherwise unduly delayed probate proceedings lacks plausibility.[15] Moreover, the allegations still more strikingly fail to allege in any meaningful way that she was injured by any delays by BNY.

_____

[15] As we have noted, the New York courts finally enjoined Ms. Lefkowitz from filing further estate-related lawsuits against BNY or her siblings without prior court permission. Lefkowitz v. Li Ka-Shing, Order Resettling Orders at p. 6.

48

Finally, as a related matter, one set of paragraphs in the amended complaint that plaintiff now cites mentions that, as executor, plaintiff incurred expenses in tracking down some property in Switzerland, although plaintiff provides no dates for such activity.[16] (Am. Compl. ¶¶ 143-46). Her generalized complaint about delay by BNY does not explain why the bank, as opposed to the estate, should be responsible for such expenses, much less offer a basis for finding a claim for reimbursement of these expenses not time-barred, at least as a separate claim for fiduciary breach. (See Am. Compl. ¶¶ 145-46) (plaintiff refers to seeking reimbursement from the Nicholas Marsh estate).[17]

3) "refusing to account" (Am. Compl. ¶¶ 80, 113)

The paragraphs cited by plaintiff for this category of alleged

_____

[16] A 1993 letter from plaintiff to a BNY vice president, which is appended to plaintiff's memorandum of law in opposition to defendants' motion to dismiss, suggests that plaintiff hired an attorney to search for Swiss assets sometime between 1991 and 1993. (Pl.'s Mem. Ex. 2 p. 2).

[17] We also note that in proceedings before the Referee, plaintiff at one point argued that a Swiss account -- presumably the same asset as she refers to in her current complaint -- should not have been included in her father's estate, possibly because she was claiming that she and one of her sisters were owners of the account. (Rudenstine Rep. II at 69-70, 72-77). This of course contradicts her current fiduciary-breach claim based on BNY's failure to marshal this account.

misconduct by BNY accuse the bank of a failure to account completely in her father's estate proceeding for monies that were deemed by the bank to be distributions to her but which were then "seized" by the bank. She further alleges that BNY has made no accounting in her mother's probate proceeding and has "unreasonably delayed" an accounting in the Hong Kong proceeding.

In fact, the proceedings referred to by plaintiff reflect that BNY has provided full accountings, and that although plaintiff may have disputed numerous aspects of those accountings, she has been given, and is being given, the opportunity to litigate her objections in the various probate proceedings.[18] Given these facts, which are subject to judicial notice, she cannot be said to have plausibly pled that BNY has refused to account for the estate assets.

_____

[18] As noted, BNY has accounted for the Irene Marsh estate through March 31, 2006, and the Westchester County Surrogate has tried and ruled on plaintiff's objections. As for the Nicholas Marsh estate, the bank has accounted through March 2006, the court has ruled on all the accountings through 1996 after extended hearings, and Ms. Lefkowitz's objections to the remaining accountings are now before the New York County Surrogate for final adjudication.

4) <u>"refusing to marshal property"</u> (Am. Compl. ¶¶ 52-55, 145)

Alleging a refusal by BNY to marshal estate property, plaintiff cites paragraphs in her complaint that refer to two episodes. First, she alleges that in May 1990 her two sisters improperly took for themselves personal property of their parents located at the parental home. She further alleges that this property was to be allocated equally to herself and her younger sister. She goes on to assert that, despite her "numerous demands", "BNY refused to marshall [sic] that personal property." (Am. Compl. ¶ 55). The other incident, already alluded to, concerns some unspecified property in Switzerland, which plaintiff says her sisters told her about and which she located through a Swiss lawyer. (<u>Id.</u> at ¶ 143). She goes on to say that this property "was marshalled [sic] into the Nicholas Marsh estate." (<u>Id.</u> at ¶ 144).

The allegations about the personal property of plaintiff's parents does not reflect a failure by BNY to marshal it. To the contrary, the proceedings cited by plaintiff reflect that the disposition of that property was the subject of probate proceedings in Westchester County, with plaintiff and her sisters disputing whether their mother had permissibly left that property to plaintiff's siblings rather than leaving its distribution to be

done in accordance with her will. In short, this episode cannot be plausibly characterized as a failure by the bank to marshal estate assets, but rather a dispute among the sisters as to the validity of the mother's disposition of the items to the other sisters -- a dispute ultimately resolved by the probate court and in plaintiff's favor. (See Pl.'s Post Appeal Status Report -- annexing In re Estate of Irene B. Marsh, Dec. 21, 2007 Decision & Order at 10-14; Pl.'s Sept. 15, 2009 letter to the Court -- attaching In re Estate of Irene B. Marsh, Apr. 16, 2009 Decision at 15-23).[19] Plaintiff also fails to plead any basis to infer that she was injured by what she characterizes as the bank's inaction, since the probate court ultimately adjudicated the issue and in fact ruled in her favor and awarded full compensatory damages and interest. (Pl.'s Post Appeal Status Report -- annexing In re Estate of Irene B. Marsh, Dec. 21, 2007 Decision & Order at 10-14; Pl.'s Sept. 15, 2009 letter to the

---

[19] We take judicial notice of the fact that BNY commenced a proceeding against plaintiff's sisters to discover information regarding the property at issue soon after plaintiff's mother's death and sought the assistance of the Surrogate's Court in finally determining ownership of the property as part of its accounting proceeding. (Pl.'s Post Appeal Status Report -- annexing In re Estate of Irene B. Marsh, Dec. 21, 2007 Decision & Order at 3-4; Streng Aff., Ex. 13). A document submitted by plaintiff in opposition to defendants' dismissal motion suggests that this proceeding was delayed pending determination in her father's estate proceeding of the meaning of a relevant clause in plaintiffs' parents will contract. (Pl.'s Mem., Ex. 2 at pp. 4-5).

Court -- attaching <u>In re Estate of Irene B. Marsh</u>, Apr. 16, 2009
Decision at 15-23, June 5, 2009 Am. Decision).

As for the Swiss property, we take judicial notice of BNY's
attempt to marshal assets by sending a BNY official to Switzerland
in 1992, although the trip was ultimately unsuccessful and
plaintiff challenged the cost of the trip. (Steng Aff., Ex. 8 at 7-
9). In addition to this effort by BNY contradicting plaintiff's
claim, plaintiff asserts no basis to infer that the bank's
purported failure to marshal these assets injured her, since the
property was, as she herself says, ultimately included in the
estate, and she was free to seek reimbursement from the estate for
any claimed expense for this endeavor.

Finally, it bears mention that during the proceedings before
Referee Rudenstine plaintiff argued that a Swiss account
(assertedly worth approximately $21 million) that BNY had included
in the estate should not have been included, and she suggested at
one point that it was in part her property. (Streng Aff., Ex. 8 at
69-78). Although it is not entirely clear whether this account is
the same Swiss property to which plaintiff alludes in this lawsuit,
if so, her claim that the bank failed to marshal this asset is
obviously completely incompatible with the position that she took

before the referee, and only underscores the implausibility of the
pleading.

### 5) "acting with conflict of interest" (Am. Compl. ¶ 108)

The plaintiff's only specific reference to an alleged conflict
of interest is an allegation that BNY had such a conflict in
connection with the Hong Kong proceeding because the bank was "the
ADR agent" for certain companies owned by Mr. Li Ka-Shing, the Hong
Kong business partner of plaintiff's father. Plaintiff alleges that
Mr. Li reported that he was holding in trust certain assets for her
father, and indeed that he paid into the Nicholas Marsh estate in
1992 approximately US $7,500,000.00, which was said to have been
received from the sale of shares of one of Mr. Marsh's companies
and held in trust for Mr. Marsh since 1984. Obscurely, plaintiff
seems to complain that if Mr. Li had not sold the shares in 1984,
they would have been worth more. She then criticizes BNY for
indemnifying Mr. Li when he transferred the funds that he was
holding to the estates, despite the absence of adequate
documentation of the stock sale, and for refusing her demand to
rescind the indemnification. (Am. Compl. ¶¶ 102-08).

We note that the District Court, in previously dismissing the

General Business Law claim, held that a beneficiary under a will does not have standing to pursue a claim against the executor for her own benefit, rather than for the benefit of the estate, when the claim originally belonged to the testator. <u>Lefkowitz</u>, 2003 WL 22480049, at * 6-7. In this case plaintiff's claim arises from the asserted misconduct by Mr. Li in selling, rather than retaining, the shares in question during Mr. Marsh's lifetime, and doing so without retaining documentation, although the complaint cannot fairly be said to have stated a viable claim for that misconduct. If we nonetheless assume at least a potential challenge by plaintiff's father based on that purported misdeed by Mr. Li, the decision by the bank, as executor, to surrender that claim would presumably give rise to a claim on behalf of the estate, not Ms. Lefkowitz. It follows, then, that even if BNY were deemed to have failed to pursue a viable claim against Mr. Li, Ms. Lefkowitz could assert it only on behalf of the estate, whereas she purports to do so solely for herself.

Finally, it appears evident that the fiduciary-breach claim in this guise is untimely. Plaintiff alleges that the sale of the shares was in 1984, and that the bank gave an indemnification to Mr. Li in the context of the Hong Kong proceeding. That apparently took place prior to 1993 (<u>Lefkowitz v. Li Ka-Shing</u>, 04-103122, Am.

55

Compl. at ¶ 30), and since the pertinent limitations period is three years, the claim is time-barred.

### 6) "violations of law as set forth above" (Am. Compl. ¶ 10)

The only paragraph cited by plaintiff for the cryptic "violation of law" allegation states that BNY has filed no accounting for the Irene Marsh estate and has neglected to file a report regarding the incomplete distribution of the estate as required by the Surrogate Court's rules.[20] As noted, BNY has indeed filed the necessary accountings, and they have led to a lengthy trial on plaintiff's objections and to a series of rulings by the Westchester County Surrogate on those issues. In addition, plaintiff fails to allege any injury to her from the purported delay or omission of the report required by the Surrogate's Court.[21]

---

[20] Because of the obscurity of the pleading, defendants assumed in their initial motion papers that the reference to "violations of law" concerned the now-dismissed RICO and General Business Law claims. (Defs.' Mem. at 9). It was only after plaintiff offered a more specific reference in her opposition to the motion that it became evident that defendants' guess was wrong.

[21] We further discuss the omission of this report at pp. 61-63, infra.

7 & 8) <u>"violations of court orders" and "violations of agreements" (Am. Compl. ¶¶ 85-94)</u>

Plaintiff links these two categories to one underlying set of facts, concerning the implementation by BNY of a set of consent orders issued by the Hong Kong court in connection with plaintiff's payment of approximately US $900,000.00 in costs to the estates. As noted, she alleges that under the settlement agreed to with BNY and embodied in the orders, BNY was to debit 93 percent of the amount she owed to her distributive share from her father's estate and the remaining seven percent to her share of her mother's estate. According to plaintiff, BNY took substantially more from her share of her mother's estate and correspondingly less from her father's estate. She complains, also in cryptic terms, that "[n]ot only did BNY violate 5 Hong Kong orders but it converted over $173,000 of plaintiff's interest in her mother's estate ($234,095.56 - 60,458.94)." (Am. Compl. ¶ 94).

As noted in our prior R&R, plaintiff does not plead a factual basis for injury by virtue of BNY taking a larger percentage of her share from the mother's estate than previously agreed to between the parties. (R&R at 30). As for her reference to "conversion", it is entirely unexplained. Indeed, the only preceding reference to

any of the figures cited by plaintiff is the allegation that the debits taken by BNY to meet Ms. Lefkowitz's cost-payment obligation included US $234,095.56 in "new distributions" from her mother's estate. (Am. Compl. ¶ 93). She does not explain how or why this use of the money injured her, and her allegations are in any event inconsistent with the assertion that the bank "converted" the money, since she herself alleges that it was used to pay off her obligation to the estates and thus did not represent an exercise by the bank of ownership or dominion over estate assets. (Id. at ¶¶ 89-93).[22]

> 9) "overpayments of professional bills of MFDDS and Oldham Li
> & Nie and failure to seek repayments" (Am. Compl. ¶¶ 37-40,
> 42, 43, 111)

Plaintiff asserts that BNY overpaid the fees of MFDDS and of Oldham Li & Nie, the Hong Kong firm that handled the ancillary probate proceeding in that jurisdiction. To the extent that plaintiff offers any clue as to the basis for these contentions, she refers to billings by MFDDS for the period 1990 to 1995, and

---

[22] We separately address below the question of whether the court should abstain on comity grounds from a claim based on the asserted violation of a Hong Kong court order over which the foreign court explicitly retained jurisdiction. See pp. 110-11, infra.

alludes to litigation about the fees in 1997. She also refers generally to attorney's fees billed in relation to the 1997 proceeding and related motion practice through 1999. The absence of specifics -- other than a cryptic reference to a "28 hour day" and an allegation of $70,000 in "local travel charges" (Am. Compl. ¶¶ 40, 42) -- means that the allegations are almost entirely conclusory and do not suffice to state a plausible, and hence viable, claim. Moreover, in any event, based on plaintiff's own account of proceedings held before the New York County probate court and the matters of which we can take judicial notice, it is apparent that these issues were aired there -- indeed, as noted, plaintiff herself alludes to that fact when referring to the interim accounting hearing (Am. Compl. ¶ 39) -- and accordingly it cannot be said that the charging and/or payment of fees that were reviewed by the Surrogate's Court may constitute a breach of fiduciary duty by the executor, much less that the plaintiff can claim injury from that asserted fiduciary breach. Finally, plaintiff's claims regarding the billings from 1990 through July 1998 are untimely under the applicable three-year statute of limitations.

10) "refusing to provide information to plaintiff about the
estate(s) to which she is entitled" (Am. Compl. ¶ 10)

The only allegations that plaintiff references in support of
this claim of denial of information are that the Irene Marsh
probate proceeding is "inactive", that BNY has filed "no
accountings" and that, "[u]pon information and belief", the bank
has not filed reports required by 22 N.Y.C.R.R. § 207.42. These
allegations, and the claim based upon them, are fatally flawed.

The reference to the alleged inactive status of the Irene
Marsh proceeding -- even if it were accurate -- does not in itself
reflect a violation by BNY of its fiduciary duties since that
status could be attributable to any number of circumstances. In any
event, we take judicial notice of the fact that the Irene Marsh
probate proceeding was initially delayed because key issues
pertinent to it were then being litigated by Ms. Lefkowitz in the
previously-filed Nicholas Marsh probate proceeding in New York
County. (See Pl.'s Sept. 15, 2009 letter -- attaching Apr. 16, 2009
Decision at 2 (noting that Irene and Nicholas Marsh's estates are
"inextricably intertwined" and that since 1990 plaintiff and BNY
litigated issues relating to both estates)). We further note that
the Irene Marsh probate case has been in an active status for some
time, that the bank did file accountings for the period ending in

March 2006, and that those filings led to a lengthy 2008 hearing and a series of decisions by the Westchester Surrogate in which he addressed all of plaintiff's objections to those accountings. Finally, plaintiff fails to allege any factual basis for a contention that she was injured by the alleged delay. In short, there is no basis for a viable claim based on plaintiff's cited allegations about the inactive status of the proceeding or the purported failure of the bank to file an accounting.

The final allegation on which plaintiff premises this version of her fiduciary-breach claim does not assist her case. She references a provision of the rules of the Surrogate's Court that requires the executor of an estate in certain specified circumstances to file a one-time skeletal report with the court to facilitate monitoring by the court of estates that have not been fully distributed within three years after issuance of the first permanent letters testamentary.[23] The regulation specifies that the only information to be provided by the executor consists of the name of the decedent, the file number, the date of issuance of the first permanent letters, the approximate amount of the gross

_____

[23] The time for filing the report is two years for estates that are not required to file federal estate tax returns. 22 NYCRR § 207.42(a).

estate, the amount already distributed, the amount left in the hands of the executor, and the reason why the estate has not yet been fully distributed. 22 NYCRR § 207.42(a). Upon receipt of the report, the court is to "take such steps as it deems appropriate to expedite the completion of the administration of the estate and the distribution of all assets." Id. § 207.42(b).

The purpose of this requirement is plainly to assist the court in monitoring estates for which letters testamentary have been issued, and it is not intended to create an obligation on the part of the executor to close out the estate within any given time frame. Indeed, the rule so states, specifying that "[t]he periods set forth in subdivision (a) of this section are not intended to set a standard time for completion of estate administration, but rather to fix a period after which inquiry may be made by the court." Id. § 207.42(d). Moreover, although the court may impose sanctions for an executor's failure to file the report, see id. § 207.42(c),[24] the determination whether to do so rests in the

---

[24] The cited section allows the court to take a failure to file into consideration when awarding commissions or legal fees. We note that the Surrogate's Court considered BNY's failure to file the required report as one factor justifying its reduction of BNY's commission in plaintiff's mother's estate by $23,000. (Pl.'s Sept. 15, 2009 letter -- attaching In re Estate of Irene B. Marsh, Apr. 16, 2009 Decision at 41).

discretion of that court. <u>See</u>, <u>e.g.</u>, <u>In re Estate of Rockefeller</u>, 44 A.D.3d 1170, 1172 n.1, 843 N.Y.S.2d 732, 735 n.1 (3d Dep't 2007).  The rule also says that this provision "shall not limit the power of the court to direct an accounting at any time on its own initiative or on petition pursuant to SCPA 2205." <u>Id.</u> § 207.42(e).

Plainly, then, the cited rule does not create an obligation running from the executor to any beneficiary, either to file a report or to distribute the estate within a given period of time. Hence, even if we credit the plaintiff's bare allegation, on information and belief, that the bank had not filed the report, that in itself would not reflect either a violation by the bank of a duty owed to the plaintiff or any injury caused to plaintiff by virtue of the non-filing.

Finally, we note that to the extent that plaintiff is seeking to imply, rather than to plead with any specificity, that BNY improperly delayed the distribution of estate assets, this allegation runs up against the noticed history of the two estates, including the extended proceedings instigated by the plaintiff in the various Surrogate's Courts, as well as her repetitive filing of satellite litigation in other judicial fora, followed by appeals of virtually all adverse rulings, almost all of which ended in

substantial or complete defeat for her and, finally, in an injunction barring further lawsuits by her of this type. In view of this extraordinary history, the conclusory assertion by her that the executor unreasonably delayed the completion of estate administration is simply not plausible.

In sum, this version of the fiduciary-breach claim fails as a matter of law.

11) "concealing BNY's wrongdoing knowingly and with intent to deceive" (Am. Compl. ¶ 109)

In this category plaintiff explicitly pleads a purported fraud claim in the guise of a fiduciary-breach theory. The specific allegation that plaintiff now references concerns the Hong Kong proceeding, in which, she asserts, BNY concealed from her and from the court corporate resolutions passed on August 23, 1990 by two family-owned businesses that both supposedly awarded her salaries and expenses "for work" that she either had done or was doing for them. The implication is that BNY committed a fraud on plaintiff and the court.

If, as plaintiff alleges, BNY acted with fraudulent intent, the pertinent statute of limitations would be six years from the

date of the fraud or two years from when the plaintiff discovered or should have discovered the fraud, whichever is longer. CPLR §§ 203(f), 213(8). <u>See</u>, <u>e.g.</u>, <u>CSAM Capital, Inc. v. Lauder</u>, __ A.D.3d __, 885 N.Y.S.2d 473, 477 (1st Dep't 2009). In this regard we note that plaintiff raised her salary claim in a separate suit in state court in 2000, and Justice Louis Barone, in dismissing that claim and all others in that lawsuit, recited that the salary issue had been disposed of by the Hong Kong court in 1994. (Streng Aff. Ex. 21 -- attaching <u>Lefkowitz v. Bank of New York</u>, Index No. 5515-00, Decision dated Dec. 15, 2000 at 2, 5-6). In short, this aspect of plaintiff's claim appears to be untimely, since the complaint here was filed seven years after the Hong Kong court's ruling, and plaintiff alleges nothing that would permit an inference that she was ignorant of the corporate resolutions until less than two years before the filing.[25]

Apart from that failing, plaintiff's pleading of this fraud-based version of her fiduciary-breach claim is plainly inadequate. Rule 9(b) would presumably require some specification of the

---

[25] Plaintiff does not allege any basis for tolling the limitations period. Moreover, she offers no basis for her implicit contention that she was unaware of these corporate resolutions, which assertedly awarded her nearly HK $420,000.00.

context of BNY's alleged fraudulent failure to disclose the corporate resolutions, and the Second Circuit has made plain that the pleader must include circumstances that provide a strong inference of fraudulent intent. Plaintiff fails to offer any basis to infer that BNY harbored such a fraudulent intent in this respect. In the absence of any apparent motive for the bank, as executor, to conceal from Ms. Lefkowitz that she was entitled to more compensation from her parents' estates for her corporate services, she would have to plead some facts that might support a finding of that required element. She completely fails, however, to do so.

In addition, plaintiff fails to allege a factual basis for inferring that the concealment of these resolutions injured her in any way. Indeed, she makes no reference to a ruling by the Hong Kong courts on the amount of compensation, if any, due to her for her alleged work for the companies. Moreover, even though the ruling of Justice Barone alludes to a decision having been rendered on salary issues, that does not establish any basis for inferring that the alleged failure of BNY to mention the cited corporate resolutions caused plaintiff to be awarded less than the amount, if any, to which she was entitled.

This last failing is particularly notable in view of plaintiff's obligation to plead a set of facts that plausibly give rise to a potential claim. If, as she claims, these two companies were family-run and she was involved in their operation, it would be a strange state of affairs indeed for the board of directors of both entities to pass resolutions on the same day awarding her specific and fairly considerable sums of money and yet not bother to tell her of their decision. That improbability is particularly noteworthy in view of plaintiff's failure even to allege directly that she was unaware of these resolutions and that her ignorance of them caused her concrete injury.[26]

12) "not keeping accurate records or account 'ledgers'" (Am. Compl. ¶¶ 80, 113)

In complaining generally about the failure of BNY to maintain "accurate records or account 'ledgers'", plaintiff cites two paragraphs from her amended complaint. Neither offers her the basis for a viable claim.

---

[26] In any event, since the Hong Kong court vetted the issue of plaintiff's entitlement to compensation for salary and expenses no later than 1994, she was plainly on notice of the basis for her claimed salary entitlement.

In the first she states that "BNY has never given an accounting of the various 'distributions to plaintiff' which it has seized", and she goes on to assert that her "records are incomplete, particularly since there has been no accounting past July 1996 in her father's U.S. estate and none at all in her mother's." (Am. Compl. ¶ 80). The second alleges, in purely conclusory terms, that "BNY has *unreasonably delayed accounting* for the Hong Kong estates." (Id. at ¶ 113)(emphasis in original).

As we have noted, the bank has in fact filed an accounting for the Nicholas Marsh estate for the post-1996 period, and Ms. Lefkowitz has contested it, resulting in a pending proceeding before the New York County Surrogate. Similarly, the bank filed its final accounting through March 2006 for the Irene Marsh estate, and plaintiff's many objections were the subject of a trial and no fewer than three decisions by the Westchester County Surrogate. In short, the factual premises for this version of the fiduciary-breach claim -- insofar as they rest on the purported absence of filed accountings by the bank -- are contradicted by the noticed record of state-court proceedings.

Insofar as plaintiff invokes her conclusory allegation of "unreasonabl[e] delay" (Am. Compl. ¶ 113) in the Hong Kong

proceeding, that effort plainly fails. The cited allegation does not even reference a failure by BNY to keep accurate records. Moreover, it is so devoid of factual content as to offer no support to any theory of fiduciary breach. Finally, plaintiff concedes that the accounting in Hong Kong was completed by December 2003. (Lefkowitz v. Li Ka-Shing, Am. Verified Compl. at ¶ 27). She alleges no facts to suggest that she was injured by the claimed delay.

13) "delegating its duties to Frank Streng" ("new exhibits attached hereto")

Plaintiff's last accusation in support of her fiduciary-breach claim is that BNY delegated its authority as executor to one of the attorneys at MFDDS, Mr. Streng. The only explanation offered for this purely conclusory assertion is the equally delphic reference in plaintiff's opposition brief to "new exhibits attached hereto". (Pl.'s Mem. at 20). A review of those documents, however, adds nothing that would provide support for such a claim, reflecting neither any impropriety by BNY in this respect nor any consequent injury to plaintiff.

Plaintiff has labeled each of the documents that she now

69

proffers with her memorandum of law to identify which of them purportedly pertain to various of her fiduciary-breach theories, and she designates several as pertinent to the improper-delegation claim. None supports it. Indeed, the only reference to anything conceivably having to do with this allegation is one answer in a deposition of Mr. Streng -- underscored or highlighted by Ms. Lefkowitz -- in which the lawyer is talking about billing by the Hong Kong attorneys. Apparently explaining why the Hong Kong solicitors' bills were sent to MFDDS rather than to BNY, Streng at one point mentions that the Hong Kong counsel treated MFDDS as the "client". (Pl.'s Mem. Ex. 2 -- annexing excerpt from Frank Streng Jan. 20, 1997 deposition, 889).[27] We infer that plaintiff is assuming that this testimony reflects some impropriety, but obviously it does not. As is customary, since MFDDS was representing the executor and the estate, it properly arranged for the hiring of foreign counsel to handle the overseas ancillary probate proceeding, and hence the law firm dealt directly with those Hong Kong solicitors on matters involving fee issues. Indeed, testimony that plaintiff cites from the hearing before Referee

---

[27] In the same vein plaintiff highlights some testimony by Mr. Streng at the hearing before Referee Rudenstine indicating that at some point he had been in contact with the Hong Kong counsel to discuss, and apparently to resist, an increase in fees demanded by those attorneys. (Pl.'s Mem. Ex. 2 -- annexing H. Tr. at 99-100, 105-06).

Rudenstine reflects that MFDDS was actively representing the interests of the estate by resisting what was an apparent attempt by the Hong Kong solicitors to increase their hourly rates. (H. Tr. at 99-100, 105-06).

In sum, even if we take account of the documents now proffered by plaintiff, which are not referenced at all in her amended complaint, that would not change the ultimate conclusion. She fails to plead a claim for fiduciary breach based on the bare allegation that BNY delegated some responsibilities to the attorneys for the estate.

Finally, this aspect of plaintiff's claim fails as well because she does not plead a viable basis for inferring that she suffered any injury from any such delegation. If pressed to speculate about her theory of injury, we would guess that, if challenged, she would contend that the delegation led to an excess of attorney fees being charged to the estate and that if the bank had done the work of the attorney, the fees would be less. Even if such rank speculation had any basis -- and we see none -- the argument would fail, since the fees were subject to active review by the relevant probate courts, and those courts did in fact address any objections by plaintiff to the fees billed by the

attorneys, even if the results were not to plaintiff's liking.

2. <u>The Aiding-a-Fiduciary-Breach Claim (Count V)</u>

Plaintiff's second remaining claim, labeled as "AIDING AND ABETTING BREACH OF FIDUCIARY DUTY", targets MFDDS and Mr. Streng and asserts that they "actively and knowingly provided substantial assistance to BNY in breaching its fiduciary duties to [plaintiff] and the estates in the conduct referred to above, and in particular by helping BNY design and carry out various schemes of wrongdoing and breaches of duty." (Am. Compl. ¶ 185). Apart from incorporating all preceding 183 paragraphs of the complaint, this portion of the pleading adds no information to buttress its conclusory assertions.

In seeking dismissal, defendants note the legal inadequacy of the preceding fiduciary-breach claims on which this aiding-and-abetting claim is premised, and they further argue that the lack of any factual allegations in Count V also fatally undermines it, since plaintiff does not identify the nature of the fiduciary duties that BNY supposedly violated, what actions either MFDDS or Streng took to aid those breaches by BNY, and the nature of any injury suffered by plaintiff as a result. (Defs.' Mem. at 12-13). Defendants further contend that some, if not all, of the alleged

misconduct took place at a time well beyond the applicable statute of limitations, and hence that the claim, insofar as it is based on such acts, is time-barred. (Id. at 13-14).

In an effort to add some flesh to the bare-bones allegations in the complaint, plaintiff responds in her memorandum of law by citing a number of preceding paragraphs in the complaint that purportedly provide specific factual allegations pertinent to the aiding-and-abetting claim.[28] These include the paragraphs invoked in support of Count IV (the fiduciary-breach claim), and about a dozen others, together with some of the documents attached to plaintiff's memorandum, which she refers to as "correspondence of MFDDS and other new exhibits offered for a second amended complaint". (Pl.'s Mem. at 20-21). These citations do not save her claim.

For pleading this type of claim, the plaintiff must allege the

---

[28] Plaintiff identifies as relevant to her aiding-and-abetting claim in Count V all of the paragraphs cited in relation to her fiduciary-breach claim in Count IV, as well as the specific paragraphs we discuss below. Some paragraphs are included on both lists. Presumably plaintiff references the paragraphs relevant to her fiduciary-breach claim merely to establish the underlying fiduciary breaches, a set of allegations that we have found to be legally insufficient. Here we focus on the paragraphs specifically cited in support of her aiding-and-abetting claim to determine the viability of Count V.

existence of a fiduciary relationship, a breach of the duties created by that relationship, knowing participation in the breach by a defendant who is not a fiduciary and injury to the plaintiff flowing proximately from the breach. See In re Sharp Int'l, 403 F.3d 43, 49 (2d Cir. 2005); Bullmore v. Ernst & Young Cayman Islands, 45 A.D.3d 461, 464, 846 N.Y.S.2d 145, 148 (1st Dep't 2007). To aid and abet a violation, the defendant must knowingly participate in the breach -- that is, he must actually know of the violation rather than have constructive knowledge -- and in pleading that person's role, the plaintiff may not "rely on conclusory and sparse allegations that the aider or abettor knew or should have known about the primary breach of fiduciary duty." Global Minerals & Metals Corp. v. Holme, 35 A.D.3d 93, 101-02, 824 N.Y.S.2d 210, 217 (1st Dep't 2006). Accord Bullmore, 45 A.D.3d at 464, 846 N.Y.S.2d at 148.

For reasons already noted, plaintiff does not plead a cognizable primary fiduciary breach. Necessarily, then, her claim for aiding and abetting those purported breaches must also fail. In addition, her effort to define a secondary-liability claim based on her aiding-and-abetting theory fails because she does not allege facts from which one may plausibly infer that either MFDDS or Mr. Streng were aware that BNY was violating its fiduciary duties to

74

plaintiff or that either or both were intentionally aiding such a breach.

In addition, to the extent that plaintiff appears to be seeking to hold both the bank and the attorneys liable for "schemes" alluded to in earlier paragraphs of the complaint, she is plainly referring to the asserted misconduct alleged in connection with her now-dismissed RICO claims. These allegations must meet not only the requirements of Rule 8 but the additional and more stringent pleading rules found in Rule 9(b). (R&R at 21-22 (citing inter alia S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp., 84 F.3d 629, 634 (2d Cir. 1996)). For reasons noted in our prior R&R, plaintiff's RICO allegations fail to satisfy these requirements. (Id. at 28-29, 32-39, 41-44).

Insofar as plaintiff seeks to strengthen this claim by now citing other portions of the complaint or the miscellaneous documents appended to her memorandum of law, this effort fails. The cited allegations state that the Irene Marsh estate is "inactive" and that accountings and required reports have not been filed in the estate proceeding (Am. Compl. ¶ 10), that BNY hired MFDDS (id. at ¶ 25), that the law firm submitted billings for 1990 to 1995 that were inadequately documented and excessive (id. at ¶¶ 37-38),

75

that BNY paid the bills (id. at ¶ 38), that there was a hearing
before Referee Rudenstine on these charges in 1997 and that the law
firm withdrew some of its expense charges at that time (id. at ¶
39), that the attorneys participated in negotiating a settlement of
plaintiff's cost obligations from the Hong Kong proceeding (id. at
¶ 92), that Mr. Streng hired the Hong Kong attorneys for the estate
(id. at ¶ 96), that the Hong Kong law firm had a conflict of
interest and one of its attorneys had been convicted of an
unspecified crime (id. at ¶¶ 97-98), that Mr. Streng served
plaintiff belatedly with certain unidentified Hong Kong papers (id.
at ¶ 110), that plaintiff was improperly surcharged for loans she
made while acting as preliminary executor of her father's estate in
an accounting proceeding held in 1994 and 1995 (id. at ¶¶ 136-39),
and that the three defendants engaged in bank fraud and violations
of the New York Penal Law by diverting or wrongfully withholding
distributions due to the plaintiff or paying "overstated" attorney
bills. (Id. at ¶ 160(i) & (j)). None of these allegations, even
liberally read, amount to a viable claim that either MFDDS or
Streng aided and abetted any fiduciary breach by BNY, or that these
two defendants acted with knowledge of such breaches by the bank,
or that plaintiff suffered any resulting injury.[29] Moreover, as

---

[29] Indeed, most of these allegations parallel assertions by
plaintiff that she has invoked in support of her preceding

defendants properly note, to the extent that any of the allegations
are sufficiently specific to allow dating of the actions about
which they complain, those claims -- none of which are based on a
fraud theory -- are time-barred with one exception[30], since the
events as alleged occurred more than three years, and in most
instances more than six years, before the filing of this lawsuit.[31]

3. <u>The Fraud Claim (Count VII)</u>

In Count VII, plaintiff asserts what she designates as a fraud
claim, which is based on the alleged failure of BNY to abide by its
agreement with her for the satisfaction of her cost obligation to
the estate under the series of orders issued by the Hong Kong
court. According to plaintiff, under the agreement her cost
obligation -- requiring payment by her of approximately U.S.

---

fiduciary-breach claim, all of which we have found insufficient
to state a claim.

[30] To the extent that plaintiff bases her aiding-and-abetting
claim on an alleged fiduciary breach in connection with the
settlement of the Hong Kong cost orders in 1999 (Am. Compl. ¶ 92)
her claim may be timely, but the underlying assertion of
fiduciary-breach is inadequately pled as discussed above and
therefore cannot support aiding-and-abetting liability.

[31] Also, to the extent that plaintiff proffers documents in
opposition to the motion as a partial response, for reasons
noted, none assists her claim of fiduciary breach, and hence none
can rescue her derivative claim of aiding such a breach.

$900,000.00 to the estates -- was to be satisfied by BNY taking 93 percent from her share of the Nicholas Marsh estate (a total of HK $6,532,075.05) and the balance from her share of the Irene Marsh estate (a total of HK $470,424.95). Instead, she says, BNY took a much smaller portion (about 74 percent) from her share of her father's estate (US $664,775.07) and a larger portion from her share of the mother's estate ($236,238.85). (Am. Compl. ¶¶ 195-203). She goes on to allege, in substance, that she was fraudulently induced to enter into the agreement by the bank's alleged misrepresentation that it would comply with the agreed-upon terms, that the bank never intended to comply, and that, but for BNY's representation to the contrary, she would not have agreed to the terms of the contract. (Id. at ¶¶ 201, 203-05).

As we have noted, to state a fraud claim, the plaintiff must allege that the defendant made a false representation about a material fact, that the defendant knew of its falsity and intended to defraud the plaintiff by the misstatement, that the plaintiff reasonably relied on the representation, and that he was injured as a result. See, e.g., Smokes-Spirits.com, Inc., 541 F.3d at 454; Keywell Corp. v. Weinstein, 33 F.3d 159, 163 (2d Cir. 1994); Spithogianis v. Haj-Darwish, 2008 WL 82188, *6 (S.D.N.Y. Jan. 7, 2008). Moreover, in proffering these allegations, the plaintiff

78

must comply with the heightened pleading requirements of Rule 9(b).

We have previously passed on the legal viability of plaintiff's fraud allegations, when assessing the same claim in its incarnation as an alleged predicate violation for plaintiff's RICO claims. In that guise we concluded that the fraud claim fails both for lack of a competent allegation that plaintiff was injured by virtue of the asserted misrepresentation and because plaintiff fails to plead facts "that give rise to an inference of fraudulent intent on the part of defendants." (R&R at 30-31) (noting that fraudulent intent cannot be inferred from failure to perform contractual obligations).

Since our prior decision, the Supreme Court has strengthened the pleading requirements of Rule 8(a) by demanding that the complaint allege facts that offer a plausible version of events giving rise to a legal claim. See, e.g., Iqbal, 129 S.Ct. at 1949. With that criterion in place, the claim still more clearly fails, since plaintiff pleads no facts from which one could plausibly surmise that the bank would have had any intention, at the time it entered into the agreement, not to comply with its terms. The agreement provided for paying off plaintiff's debt by debiting her distributions from the two estates, and there is no basis in any

allegation in the complaint for inferring that the bank had any motive to inveigle plaintiff into agreeing to a procedure that the bank knew it would not follow.[32] Absent such a factual allegation, the fraud claim does not pass muster.

As plaintiff notes, in our prior R&R we also addressed this claim in passing as being potentially construed as one for breach of contract. (Pl.'s Mem. at 21 (citing R&R at 59 and <u>Lefkowitz</u>, 2003 WL 22480049, at * 4)). In doing so we were analyzing whether the probate exception applied and concluded, as did the District Court, that the exception did extend to this claim. Since the Second Circuit has now held to the contrary, we are left to assess whether Count VII, construed as a claim for contract breach, is legally viable.

Under New York law, the required elements for a breach of

---

[32] Indeed, to the contrary the document reflecting the bank's refusal to adhere to the allocation for which plaintiff asked -- a document proffered by defendants but arguably reviewable on the current motion as integral to the complaint -- reflects that the decision to use a different allocation was traceable to a shortage of sufficient available funds in the Nicholas Marsh estate. (Streng Aff., Ex. 16 p. 3). In any event, as noted, plaintiff pleads no facts that would justify an inference of fraudulent intent. Plaintiff merely asserts that BNY's counsel revealed that BNY did not intend to honor the agreement (Am. Compl. ¶ 203), but that assertion does not constitute the pleading of facts to support a plausible fraud claim.

contract claim are the existence of a contract, the breach of that contract by the defendant, adequate performance of the contract by the plaintiff, and resulting damages. Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004); Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004); Kramer v. Lockwood Pension Servs., Inc., __ F. Supp. 2d __, 2009 WL 2878100, * 24 (S.D.N.Y Sept. 1, 2009).

There is no question that plaintiff adequately pleads the making of a contract between her and BNY, an agreement that was then embodied in the cited consent orders of the Hong Kong court. There is also no question that she alleges that BNY breached the agreement insofar as it utilized a larger percentage of her share of her mother's estate when paying off her debt to the estates than had been provided in the agreement. What is not at all apparent, however, is that she has plausibly pled that she was injured thereby, which is a required element of a contract-breach claim.

As we observed in our prior R&R, there appears to be no basis for inferring any injury to Ms. Lefkowitz, since she was a 30 percent beneficiary of both estates, and hence, whatever the percentages of the debt BNY accounted for from her respective anticipated distributions from the two estates, the total net

distributions to her from the two estates would remain the same. (R&R at 29-30, 60 n.18). Plaintiff offers no allegation that would suggest otherwise, and indeed, on the current motion, she proffers a 2009 post-trial decision by the Westchester County Surrogate that explicitly finds no injury from the bank's asserted deviation from the agreed percentages: "The court agrees with BNY that Adrienne was not harmed by BNY's decision to deviate from the Hong Kong consent orders concerning what percentages of the agreed-upon costs were to be paid from Adrienne's shares of this estate and Nicholas's estate." (Pl.'s Sept. 15, 2009 letter –- attaching In re Estate of Irene Marsh, Apr. 16, 2009 Decision at 26-27).

Plaintiff's failure to plead a plausible basis for inferring injury to her from BNY's accounting for her Hong Kong debt is fatal to Count VII as a viable claim, whether read as a contract-breach or a fraudulent-inducement claim. Hence, even if we ignore the collateral-estoppel effect of the finding by the Surrogate's Court, the claim, whether construed as sounding in contract or in fraud, would have to be dismissed.

4. Fraudulent Concealment (Count VIII)

The remaining claim that survived the Second Circuit's review

82

is plaintiff's assertion that all three defendants "repeatedly engaged in acts of fraudulent concealment." (Am. Compl. ¶¶ 211-13). The three repeated assertions of this mantra are said to "relate[]", respectively, "to improper bills from and payments to MFDDS and Oldham Li & Nie", "to seizures of distributions due plaintiff", and "to BNY's commercial relationship with and conflict of interest related to Li Ka-Shing." (Id.). Apart from this completely conclusory set of allegations, this part of the complaint is entirely silent.

In an effort to provide some guidance as to what these cryptic allegations are intended to refer to, plaintiff cites a host of other paragraphs from the complaint in her opposition papers. These include paragraphs 37-44, 59-80, 95-113, and 195-209, as well as, more generally, the documents that she has appended to her memorandum in opposition. (Pl.'s Mem. at 21-22). These additions, however, do not salvage plaintiff's claim.

To state a claim for fraudulent concealment, the plaintiff must plead the elements of a fraud claim -- substituting a description of what was concealed for what was mis-stated -- and must also allege that the defendant had a duty to disclose the specified information and failed to do so. See, e.g., Lerner, 459

83

F.3d at 291-92; <u>Kaufman v. Cohen</u>, 307 A.D.2d 113, 119-20, 760 N.Y.S.2d 157, 165 (1st Dep't 2003). Moreover, the pleader must comply with the requirements for specificity mandated by Rule 9(b).

The cited allegations fail to meet these requirements. Paragraphs 37 to 44 allege that MFDDS billed excessive fees and improper charges, that BNY paid them and did not seek to recover the overcharges, and that in connection with a hearing in the Surrogate's Court that reviewed the fees charged, the law firm agreed to withdraw its claim for certain disbursements. These allegations do not reflect any concealment of facts from plaintiff, do not indicate that any omitted facts were material, do not remotely suggest that she relied on the omission or that such reliance was reasonable, and fail to allege any basis for concluding that she was injured by any such reliance. Plaintiff does mention that she has been unable to obtain copies of more recent bills from the law firm (Am. Compl. ¶ 43) but does not allege any basis for concluding that defendants were obliged to disclose the firm's billing records to plaintiff or that she reasonably relied on this omission to her detriment.

Paragraphs 59 to 80 are equally inadequate to offer the basis for a fraudulent-concealment claim. This portion of the pleadings

84

first outlines the respective shares of the various family members in the estates of Mr. and Mrs. Marsh, and then goes on to allege that at various times BNY made distributions but on several occasions withheld portions or all of the distributions that would have gone to plaintiff, apparently on the basis that the withheld funds should be used, or held for possible use, to offset debts of plaintiff to the estates.

Plaintiff alleges that the first withholding by the bank took place at the time of a distribution in 1995. She does not allege that the bank concealed this action from her; to the contrary, she says that the bank notified her and that the distribution was paid to her in October 1995 pursuant to a court order. (Am. Compl. ¶ 66-68).

Plaintiff further alleges that the bank made another distribution on October 7, 1997, but withheld her share without giving her notice. She alleges that she nonetheless learned of the withholding at the time because her daughter's trust received her own distribution from the estate at the same time. She also alleges that her own share was placed in a separate account by the bank to which she did not have access. (Id. at ¶¶ 70-72). She further alleges that in 1998 those escrowed funds were transferred back to

the main account of the Nicholas Marsh estate to pay off surcharges against her. (Id. at ¶ 73).

Plaintiff goes on to state that the bank made other distributions after 1997, but that she lacks "specific information about the amounts or dates". Nonetheless, she proceeds to allege that a distribution was made in April 2001 from the Nicholas Marsh estate in the amount of $900,000.00, and that the $270,000.00 of that distribution that she should have received was "seized" without notice to her and placed in an account over which she has no control. (Id. at ¶ 75). She further alleges that in the same month the bank distributed $800,000.00 from the Irene Marsh estate, but paid her only $100,000.00 instead of her full share of $240,000.00, and that previously, in 1998, it had seized $450,000.00 from her share in that estate. (Id. at ¶¶ 78-79). Although plaintiff professes not to have received notice of some of these diversions, she alleges -- with uncharacteristic specificity -- the precise amounts of the diversions still resting in the bank's separate accounts. Thus she alleges that as of June 12, 2001, "the balance in the account holding various seized distributions from the Estate of Nicholas Marsh diverted by BNY from plaintiff was $632,541.46" and that as of the same date the amount diverted from her share of the Irene Marsh estate and

resting in a separate account was $409,834.07. (Id. at ¶¶ 76-77).

Insofar as plaintiff may be relying on these allegations to buttress a fraudulent-concealment claim, they fail to do so. Plaintiff pleads no facts permitting an inference of concealment. Indeed, despite her assertion that the bank did not give notice of some of the withholdings, she plainly has that information, which she pleads down to the last penny. She also offers no factual basis for inferring any fraudulent intent by the bank, and pleads nothing to suggest that she in any way relied on the absence of information to her detriment, much less that she was injured by the bank's failure to notify her of the diversions.

We also note that, to the extent that plaintiff relies for this claim on the further assertion that the bank has concealed matters from her because it has "never given an accounting of the various 'distributions to plaintiff' which it has seized, . . ., particularly since there has been no accounting past July 1996 in her father's U.S. estate and none at all in her mother's" (id. at ¶ 80), her assertions are belied by the record of which we may take notice. As previously observed, accountings have been rendered and contested in both estates, the Westchester Surrogate's Court has made comprehensive rulings about the accountings through March 2006

in her mother's estate, and the New York County court is proceeding to deal with plaintiff's objections filed in connection with the bank's accounting for her father's estate. In short, even if any of the withholdings and their application to asserted obligations of the plaintiff were improper, she is receiving judicial review and determinations on those matters in state court. This underscores the absence of any basis for claiming either non-disclosure or fraudulent intent or injury from any failure to make timely disclosures.

The next set of cited paragraphs, numbered 95 to 113, pertain to the Hong Kong proceeding. In them plaintiff offers a potpourri of accusations against BNY and Streng, though none suffices to state a claim for fraudulent concealment. She first notes that these defendants knew as early as 1988 that Li Ka-Shing held assets of Nicholas Marsh, and alleges that BNY did not act to marshal them when it was first appointed as executor in 1990. In this connection, however, she states that Li reported having such assets in 1991 and that he paid approximately US $7.5 million to the estate in 1992. (Id. at ¶¶ 95, 102-03). She goes on to complain that Li had originally held shares of stock for her father and that, if not sold by Li in 1984, those shares would have greatly appreciated in value, presumably suggesting that his sale of stock

88

in 1984 was inadvisable or possibly that Li lied about the sale since he did not have proper documentation of it. (Id. at ¶¶ 103-05). She also complains that, despite the absence of proper documentation, BNY released and indemnified Li and refused plaintiff's request that it rescind this agreement. (Id. at ¶¶ 106-07).

The balance of the cited paragraphs pertain to one or more alleged conflicts of interest by the Hong Kong lawyers hired by MFDDS and by BNY and to a dispute about salaries supposedly owed to plaintiff by two of her father's companies. Thus plaintiff says that one attorney in the Oldham Li & Nie firm at some point left and took a position with a company owned by Li Ka-Shing (id. at ¶¶ 100-01), and she further alleges that BNY, though asserting that it had no conflicts, was "the ADR agent for Mr. Li's key companies . . . ." (Id. ¶ 108). She also alleges that BNY "concealed from plaintiff and the Hong Kong court official corporate resolutions from the family Hong Kong companies awarding plaintiff salaries for her work." (Id. at ¶ 109)

Finally, she alleges that Mr. Streng served her with papers from the Hong Kong proceeding "after the Court date was passed." (Id. at ¶ 110)(emphasis in original). She does not specify,

89

however, what court papers she is referring to.

    None of these allegations supports a fraudulent-concealment claim. First, she offers no allegations that would permit an inference that the assets put into the estate by Mr. Li Ka-Shing were not the full amount he held, much less that the bank was aware of that fact and concealed it from her and from the Hong Kong court. Indeed, she reports that she asked the bank to rescind its release and indemnification of Mr. Li, apparently because she had reason to believe that he had withheld or mishandled assets, thus reflecting that she was aware of the circumstances. Second, she also offers no basis for inferring that she was injured by virtue of a failure by BNY to tell her what it knew about these assets.

    As for the alleged ties of BNY to two companies of Mr. Li, she fails to allege any basis for inferring that the asserted concealment of those ties injured her in any way. Indeed, as noted, she asserts, in substance, that she was opposed to BNY's release of Mr. Li, even if she was unaware of the purported link, and that she protested the bank's actions in apparently timely fashion.

    The remaining claim of concealment concerns the alleged corporate resolutions. Ms. Lefkowitz alleges that BNY hid what she

refers to as "official corporate resolutions from the family Hong Kong companies awarding plaintiff salaries for her work." She goes on to specify two resolutions, both passed on August 23, 1990, one from Arcadia Trading Co. and the other by Sederland Enterprises. According to plaintiff, the first awarded her HK $357,500.15 in salary and HK $39,137.60 as expenses, and the second gave her US $20,833.00 "for April 1, 1989 to January 31, 1990." (Id. at ¶ 109). She does not allege, however, that BNY had a duty to inform her of these resolutions, and, as we posited above, it is implausible that plaintiff would not have known about the actions of these family corporations for which she had apparently been working. Moreover, plaintiff fails to allege that the purported concealment of the resolutions themselves actually harmed her in any way.

This last pleading is plainly inadequate. Rule 9(b) requires some specification of the context of the alleged fraudulent concealment, and plaintiff must allege circumstances that provide a strong inference of fraudulent intent. Plaintiff fails to offer any basis for BNY to harbor such an intent in this context, and offers no circumstances that might support a finding of that required element. In addition, as noted, she fails entirely to allege a factual basis for inferring that the concealment of these resolutions injured her. Indeed, she does not even allege in

conclusory fashion that she was injured by this asserted omission.

### 5. Conclusion as to Counts IV, V, VII and VIII

For the reasons noted, we conclude that Counts IV, V, VII and VIII of plaintiff's amended complaint fail to state a cognizable claim. For that reason they should be dismissed.

As for the nature of the dismissal, we start with the premise that a plaintiff whose initial pleading is deemed legally defective and therefore subject to dismissal is ordinarily given leave to amend at least one time if the defects noted are potentially remediable. See, e.g., Porat v. Lincoln Towers Cmty. Ass'n, 464 F.3d 274, 276 (2d Cir. 2006). In this case, however, for a variety of reasons we recommend that the dismissal, even if predicated on a failure to satisfy Rules 8(a) and 9(b), be with prejudice.

First, we note that the current pleading is actually plaintiff's second version, although the original amendment was done early in the litigation and not as a result of a dismissal motion. Second, substantial portions of the pleadings at issue are, or appear to be, time-barred based either on the face of the complaint or on facts that we may judicially notice, and hence in

any event they are subject to final disposition at this point. Third, in response to the motion to dismiss, plaintiff has in fact sought leave to amend in specified respects, notably by proffering additional exhibits to be annexed to the current complaint. We have taken those additional documents into consideration when assessing plaintiff's response to the defendants' Rule 12(b)(6) and 9(b) arguments, and have concluded, for reasons already discussed, that these proposed amendments do not save the pleading. Fourth, as we discuss below, much if not all of the current pleading is subject to dismissal as a result of prior state-court decisions, and in any event this lawsuit is but one of a host of actions filed by the plaintiff which largely parallel each other in the pursuit of her many grievances about the handling of the estates of her parents. Accordingly, plaintiff has had and continues to have more than ample opportunity to exhaust every last particle of her due-process right to be heard on each of her many complaints.


II. <u>The Effect of Prior Decisions on Plaintiff's Claims</u>


As an alternative ground for dismissal, defendants invoke the defenses of collateral estoppel and res judicata based on earlier rulings by the many state courts that have passed on claims that mimic or parallel the claims plaintiff asserts here or that made

findings on factual contentions that are material to plaintiff's current claims. (Defs.' Mem. at 18-20). We briefly examine that set of arguments.

As a federal court before which the defendants invoke state-court rulings as a bar to litigation of some of the claims now before us, we must look to how the state courts would treat these defenses. E.g., Allen v. McCurry, 449 U.S. 90, 95-96 (1980); Leather v. Eyck, 180 F.3d 420, 424 (2d Cir. 1999). For reasons that follow, a substantial portion of plaintiff's claims are barred as a matter of law. We start with the governing standards for these two defenses.

New York has adopted a transactional approach to claim preclusion, also referred to as res judicata. Thus, "'a final judgment on the merits of an action precludes parties or their privies from relitigating issues that were or could have been raised in that action.'" Monahan v. New York City Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000)(quoting Allen, 449 U.S. at 94). "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." O'Brien v. City of Syracuse, 54 N.Y.2d 353, 357,

445 N.Y.S.2d 687, 688 (1981). See Smith v. Russell Sage Coll., 54 N.Y.2d 185, 192, 445 N.Y.S.2d 68, 71 (1981) (noting that res judicata applies where different legal theories of relief are grounded on the same "congeries of facts", even when the different legal theories "'depend on different shadings of the facts, or would emphasize different elements of the facts or would call for different measures of liability or different kinds of relief.'") (quoting Restatement (Second) of Judgments [Tent. Draft No. 5], § 61, comment c)), reh. denied, 55 N.Y.2d 878, 448 N.Y.S.2d 1026 (1982).

This principle does not afford a defense, however, if the initial forum lacked the authority to grant the full measure of relief sought in the later litigation. See Jacobson v. Fireman's Fund Ins. Co., 111 F.3d 261, 265 (2d Cir. 1997); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Res judicata also does not apply if "'formal jurisdictional or statutory barriers'" previously prevented the plaintiff from "'presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law.'" Jacobson, 111 F.3d at 265 (quoting Burgos, 14 F.3d at 790).

As for issue preclusion, or collateral estoppel, under New

York law it

> precludes a party from relitigating in a subsequent action
> or proceeding an issue *clearly raised* in a prior action or
> proceeding and decided against that party . . ., whether or
> not the tribunals or causes of action are the same. The
> doctrine applies if the issue in the second action is
> identical to an issue which was raised, necessarily decided
> and material in the first action, and the plaintiff had a
> full and fair opportunity to litigate the issue in the
> earlier action.

Leather, 180 F.3d at 425 (emphasis in original) (quoting Parker v.

Blauvelt Volunteer Fire Co., 93 N.Y.2d 343, 349, 690 N.Y.S.2d 478,

482 (1999)). See Sullivan v. Gagnier, 225 F.3d 161, 166 (2d Cir.

2000); Ryan v. New York Tel. Co., 62 N.Y.2d 494, 500, 478 N.Y.S.2d

823, 826 (1984).[33]

The collateral estoppel doctrine applies irrespective of

whether the tribunals or causes of action in the two proceedings

are the same. See Sullivan, 225 F.3d at 166. Moreover, the parties

in the two proceedings need not be identical. Rather, the defense

may be invoked by "'a nonparty to a prior litigation . . . [whose]

---

[33] In contrast to claim preclusion, which bars the litigation
of claims that could have been raised in a prior lawsuit, issue
preclusion bars the relitigation of issues actually raised and
decided in the prior proceeding, as long as that determination
was essential to the prior judgment. See Cent. Hudson Gas & Elec.
Corp. v. Empresa Naviera Santa S.A., 56 F.3d 359, 368 (2d Cir.
1995).

own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or [are] derivative of, the rights of the party to the prior litigation.'" Juan C. v. Cortines, 89 N.Y.2d 659, 667-68, 657 N.Y.S.2d 581, 585 (1997) (quoting D'Arata v. New York Cent. Mut. Fire Ins. Co., 76 N.Y.2d 659, 664, 563 N.Y.S.2d 24, 27 (1990)).

The party invoking collateral estoppel must demonstrate the identity of the issues in the prior and current litigations and must establish that the issues were previously decided on the merits. The party seeking to defeat the application of the defense has the burden of establishing the absence of a full and fair opportunity to litigate the issues in the prior action. See Warney v. McMahon, Martine & Gallagher, 1998 WL 575188, *3 (S.D.N.Y. Sept. 9, 1998)(citing Kaufman v. Eli Lilly & Co., 65 N.Y.2d 449, 456, 492 N.Y.S.2d 584, 588 (1985)).

Application of these standards to plaintiff's current claims demonstrates that a number of them are barred from further consideration. We address the relevant claims seriatim.

Plaintiff accuses defendants of having overbilled the fees of the attorneys, but those issues, at least for the time period to

which plaintiff refers, have been addressed by the Surrogate's Courts for New York County (through July 31, 1996) and for Westchester County (through March 2006). (See Rudenstine Rep. II at 138-57; Streng Aff., Ex. 9 at 1-23; Redis Aff., Ex. G at 6; In re Estate of Nicholas Marsh, 1980/88, Aug. 14, 2002 Order at 2-3; Pl.'s Post Appeal Status Report -- annexing In re Estate of Irene B. Marsh, Feb. 1, 2008 Decision & Order at 12-13; Pl.'s Sept. 15, 2009 letter -- attaching In re Estate of Irene B. Marsh, Apr. 16, 2009 Decision at 28-42). The findings of those courts, which approved fees of specified amounts, are conclusive on plaintiff.

The question of the allocation of plaintiff's Hong Kong cost obligation between her shares of her father's and mother's estates was addressed by Westchester County Surrogate Scarpino, who concluded that she was not injured by the bank's asserted deviation from the provisions of its agreement with plaintiff. (Pl.'s Sept. 15, 2009 letter -- attaching In re Estate of Irene B. Marsh Apr. 16, 2009 Decision at 26-27). That finding is conclusive on her effort to assert a claim -- whether of fraud or of breach of contract -- against BNY for its implementation of that agreement.

Plaintiff complains of BNY's assertedly wrongful withholding of some of her distributions in 1995, a claim that was addressed in

Surrogate Preminger's October 5, 1995 order granting plaintiff's motion to compel the distribution of the withheld funds to her, Referee Rudenstine's 1998 report in which he awarded plaintiff interest for the period of the withholding, and the subsequent August 14, 2002 order of Surrogate Preminger rejecting the award of interest. (Streng Aff., Ex. 10; Rudenstine Rep. II at 63-68; In re Estate of Nicholas Marsh, 1980/88, Aug. 14, 2002 Order at 3). The Surrogate's determination that Ms. Lefkowitz was not entitled to interest on the withheld funds because BNY did not exhibit bad faith in refusing to distribute the funds prior to the Surrogate's order to do so is binding on plaintiff here. See In re Estate of Nicholas Marsh, 1980/88, Aug. 14, 2002 Order at 3. Similarly, the bank's later distributions were adjudicated before the Referee and both the New York County and Westchester County Surrogates, and their determinations are also binding. (Streng Aff., Ex. 11 (Referee's report and Surrogate Preminger's order approving BNY's 1997 withholding of plaintiff's distribution from her father's estate); In re Application of Lefkowitz, 2006 WL 3069296, at *4 (approving BNY's withholding of balance of segregated distributions from mother's estate from plaintiff); Pl.'s Sept. 15, 2009 letter -- attaching In re Estate Irene B. Marsh, Apr. 16, 2009 Decision at 23-28 (finding withholdings from plaintiff in her mother's estate were unwarranted and awarding interest as compensation) & Aug. 28,

2009 Decision & Order at 9-12).

Plaintiff's fiduciary-breach allegation against BNY based on its having released and agreed to indemnify Li Ka-Shing when he transferred assets to her father's estate was asserted by her as well in her 2004 New York County lawsuit against the bank, and that claim was dismissed -- as were all of her other claims in that lawsuit -- on the merits. (See Lefkowitz v. Li Ka-Shing, Am. Verified Compl. ¶¶ 57-65, 77(c), 82-87, 104-05, 126-28; Lefkowitz v. Li Ka-Shing, Order Resettling Orders at 4-5 (dismissing all claims on grounds of statute of limitations, res judicata and lack of standing), aff'd, 30 A.D.3d 334, 819 N.Y.S.2d 494 (1st Dep't 2006)(affirming dismissal on same grounds and approving imposition of sanctions)).

Plaintiff complains about the bank's supposed concealment of corporate resolutions awarding her salary and expense reimbursement. Plaintiff's claim for additional salary and expense compensation was addressed in 1994 by the Hong Kong court and in 2000 by the New York State Supreme Court and was rejected by both. (Streng Aff., Ex. 20 at ¶¶ 33-34, 39-41, 69, Ex. 21 at pp. 2, 4, 5). Although the current claim about concealment may be viewed as asserting a  different theory of liability, in the earlier state-

100

court litigation plaintiff was confronted with statute-of-limitations and res judicata defenses, and it appears that she never asserted on that occasion that the corporate resolutions had been hidden from her even though such a claim of fraudulent concealment was available to her and would presumably have provided a basis for equitably tolling the statute of limitations and for avoiding a res judicata bar.[34] The non-assertion of that claim in the earlier case should bar its assertion now under the governing principles of res judicata.

Insofar as plaintiff complains about the appropriation of her mother's tangible personal property pursuant to a gift from Mrs. Marsh, that issue was adjudicated by the Westchester County Surrogate, who also awarded what he deemed full compensation to plaintiff. (See Pl.'s Post Appeal Status Report -- annexing In re Estate of Irene B. Marsh, Dec. 21, 2007 Decision & Order at 13-14; Pl.'s Sept. 15, 2009 letter -- attaching In re Estate of Irene B. Marsh, Apr. 16, 2009 Decision at 13-23; June 5, 2009 Am. Decision After Trial & Aug. 28, 2009 Decision & Order at 5-9).

--------

[34] Indeed, it appears that plaintiff even annexed the resolutions in question to her 2000 complaint, and despite their presence in the record in that case the court dismissed the claim.

III. <u>Abstention</u>

As an alternative argument, defendant suggest that if any of plaintiff's claims survive their principal theories for dismissal, the court should nonetheless decline to hear them on one of two abstention theories, commonly referred to as <u>Younger</u> and <u>Colorado River</u> abstention. (Defs.' Mem. at 20-24). In a slight variation offered in defendants' reply papers, they argue that surviving claims should at least be stayed pending completion of proceedings in the state probate courts. (Defs.' Reply Mem. at 8-9). In addition, defendants argue as a separate matter that any claims premised on BNY's alleged violation of the Hong Kong consent orders should be dismissed as a matter of comity, since the Hong Kong courts retain jurisdiction over their own orders. (Defs.' Mem. at 24-25).

So-called <u>Younger</u> abstention derives from the Supreme Court's decision in <u>Younger v. Harris</u>, 401 U.S. 37 (1971), in which the Court addressed the propriety of a federal court entertaining a suit to enjoin an ongoing state criminal proceeding based on a claim of constitutional dimension. <u>Younger</u> and its progeny "generally require[] federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or

call into question ongoing state proceedings." Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002). Otherwise stated, "federal courts should generally refrain from enjoining or otherwise interfering in ongoing state proceedings." Spargo v. New York State Comm'n on Judicial Conduct, 351 F.3d 65, 74 (2d Cir. 2003). For such abstention to be required, there must be an ongoing state proceeding (whether criminal or civil)[35], that proceeding must implicate an important state interest, and the state proceeding must offer the federal plaintiff an adequate opportunity to air the federal constitutional claims that form the basis for his federal-court lawsuit. See, e.g., Liberty Mut. Ins. Co. v. Hurlbut, __ F.3d __, 2009 WL 3617698, * 7 (2d Cir. Nov. 4, 2009); Bailey v. Pataki, 636 F. Supp. 2d 288, 296 (S.D.N.Y. 2009). If these criteria are met, abstention is generally mandatory because Younger and its progeny "'espouse a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances.'" Mirka United, Inc. v. Cuomo, 2007 WL 4225487, *2 (S.D.N.Y. Nov. 27, 2007)(quoting Middlesex County Ethics Comm., 457 U.S. at 431).

---

[35] Although Younger involved a state criminal case, its holding has been applied to pending civil cases, see, e.g., Kaufman v. Kaye, 466 F.3d 83, 86 (2d Cir. 2006), and even to administrative proceedings. See Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432-35 (1982).

Younger abstention is available when the federal plaintiff is seeking some form of equitable relief, whether an injunction or a declaration that has the practical effect of an injunction, but is generally not available in cases involving federal claims for damages. Indeed, the Supreme Court has observed that abstention principles -- not limited to Younger abstention -- have been applied in actions at law only to stay the case rather than to dismiss it. See Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 719-20 (1996). See also Gilbertson v. Albright, 381 F.3d 965, 975-84 (9th Cir. 2004)(en banc). The Supreme Court has not reached the precise question of whether and in what circumstances Younger abstention may be available to dismiss or stay a federal lawsuit involving claims at law, and the circuit courts have not followed an entirely consistent path, but the Second Circuit has indicated that such abstention is not appropriate to block a damages claim. See, e.g., Rivers v. McLeod, 252 F.3d 99, 101-02 (2d Cir. 2001); Kirschner v. Klemons, 225 F.3d 227, 238 (2d Cir. 2000). Accord Morpurgo v. Inc. Vill. of Sag Harbor, 327 Fed. Appx. 284, 285-86 (2d Cir. 2009). Compare, e.g., Gilbertson, 381 F.3d at 984 (holding Younger abstention may apply to damage claims, but only to permit a stay of federal proceeding).[36]

---

[36] We note that even the Second Circuit has not been entirely consistent in saying that a damage claim may never be subject to

In this case plaintiff's claims are limited to seeking damages. Moreover, even assuming that the Second Circuit would recognize an "exceptional circumstance" exception to its general rule precluding <u>Younger</u> abstention on claims at law, defendants entirely fail to address why such an exception would apply here.[37]

In addition, as the proponent of this form of abstention, defendants fail to address with any clarity the specifics of what proceedings still remain open and what claims are left for adjudication in those proceedings, thus failing to demonstrate the initial basis for a potential <u>Younger</u> abstention ruling.

---

<u>Younger</u> abstention. Thus, even in <u>Kirschner</u> it observed that "[w]hen money damages, as opposed to equitable relief, are sought, it is less likely that unacceptable interference with the ongoing state proceeding, the evil against which <i>Younger</i> seeks to guard, would result from the federal court's exercise of jurisdiction." 225 F.3d at 238.

[37] It bears mention that the <u>Younger</u> cases have addressed the circumstance of a federal plaintiff asserting federal constitutional claims that would interfere with an ongoing state proceeding. <u>See</u> <u>Hartford Courant Co. v. Pellegrino</u>, 380 F.3d 83, 100-01 (2d Cir. 2004)(discussing requirement that the state court proceeding afford the federal plaintiff adequate opportunity for judicial review of his or her federal constitutional claims); <u>Diamond "D" Constr. Corp.</u>, 282 F.3d at 198 (describing <u>Younger</u> as blocking federal court jurisdiction over federal constitutional claims in context of due process claim). Plaintiff asserts no federal claims at this point -- constitutional or otherwise -- having been left with a set of state common-law claims. Neither side addresses the significance, if any, of this fact for purposes of a <u>Younger</u> analysis, and we therefore do not pursue it here.

In sum, we see no basis on the present record to justify refusing to hear any possibly surviving claim based on <u>Younger</u> abstention.

Defendants' alternative abstention argument is premised on the Supreme Court's decision in <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800 (1983), and its progeny. This line of cases authorizes a federal court to stay a federal lawsuit because there is related litigation pending in state court. In assessing such an application the court should consider a variety of circumstances, including "(1) whether the controversy involved a *res* over which one of the courts has assumed jurisdiction, (2) whether one forum is more inconvenient than the other for the parties, (3) whether staying the federal action will avoid piecemeal litigation, (4) whether one action is significantly more advanced than the other, (5) whether federal or state law provides the rule of decision, and (6) whether the federal plaintiff's rights will be protected in the state proceeding." <u>United States v. Pikna</u>, 880 F.2d 1578, 1582 (2d Cir. 1989)(citing <u>inter</u> <u>alia</u> <u>Colorado River</u>, 424 U.S. at 817-18; <u>Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 15-16, 19-23, 26 (1983)). Abstention on this basis is generally disfavored, and should be granted only in "exceptional" cases. <u>Colorado River</u>, 424 U.S. at

813.

As noted, the relief that would be awarded under this form of
analysis would be a stay rather than dismissal. In this regard it
bears mention that the Second Circuit, even while rejecting <u>Younger</u>
abstention -- to the extent that it commands dismissal -- for at-
law claims, has indicated that a stay of such claims may be
appropriate. <u>See</u> <u>Kirschner</u>, 225 F.3d at 238. Thus, a stay may
actually be justified if defendants can show circumstances that
might trigger some of the concerns underlying <u>Younger</u> and its
progeny even if the defendants do not fully satisfy the more
demanding <u>Colorado River</u> criteria.

As for the <u>Colorado River</u> factors, defendants do not address
them with great specificity, but the record suffices for us to draw
certain conclusions. The plaintiff's claims that survived the
appeal in this case do not directly involve a res, although the
probate courts have, in substance, assumed jurisdiction over the
assets of plaintiff's parents' estates. There is also no
significant difference in convenience to the parties between
litigating in state or in federal court, but there is plainly
inconvenience in having to litigate actively in both state and
federal courts at the same time. As a related matter, if plaintiff

were to be allowed to pursue some or all of her remaining claims here while there was a continuing proceeding in the New York County Surrogate's Court, the parties would face the almost inevitable prospect of piecemeal, and indeed duplicative, litigation. As for the status of the parallel cases, the New York County probate proceeding appears decidedly more advanced than this action. From what has been said by both parties, we gather that BNY has rendered its final accounting for the Nicholas Marsh estate, and Ms. Lefkowitz has long ago filed her objections. It thus appears that that case is likely to be disposed of relatively soon by summary judgment or by trial or both.[38] In contrast, in this case discovery was far from complete when it was stayed as a result of the defendants' 2002 motion to dismiss. As for the relevant body of law, plaintiff's claims here are all based on New York law. Indeed, plaintiff has no remaining federal claims in this case, and the probate proceedings do not involve any federal issues.

Finally, it appears that the plaintiff's rights will be adequately protected in the probate proceeding. In this regard,

---

[38] The probate proceeding in plaintiff's mother's estate appears to have concluded and would thus presumably no longer justify abstention. (See Pl.'s Sept. 15, 2009 letter (attaching Westchester County Surrogate's decisions following trial on objections to final accounting in Irene B. Marsh estate)).

108

although plaintiff has repeatedly complained about her treatment in
state court, the history of her extensive and extremely persistent
involvement in the various probate proceedings, her invariable
appeals from adverse decisions of the various surrogates, her
repeated resort to satellite lawsuits to re-litigate issues
determined in the probate proceeding, and the extraordinarily
extensive court rulings and explanations for their decisions amply
demonstrate that plaintiff has been given, and continues to be
given, ample opportunity to be heard in state court. The fact that
most, though not all, of plaintiff's complaints have been rejected
does not itself reflect a failure by the state courts to protect
her rights, but rather suggests the threadbare nature of those of
her claims that have been rejected.

These findings suggest that if any of plaintiff's claims
survive the defendants' motion to dismiss, a stay may be warranted.
Whether such a remedy is justified, however, must depend on which
claims or which portions of any of these claims remain for
adjudication. If the surviving claims encompass issues that will be
the expected subject of adjudication in the pending Nicholas Marsh
estate proceeding in the New York County Surrogate's Court, then a
stay will be appropriate, particularly in view of the extended and
extensive nature of the probate proceedings, the pattern of

extensive and often abusive repetitive separate state-court lawsuits by plaintiff (which, as noted, has led to her being enjoined from filing any more against Mr. Li Ka-Shing, the Bank of New York or her parents' estates absent judicial permission) and the far greater familiarity of the state probate court with the tangled history of the parents' respective estates. If, however, there is no reason to believe that the surviving claim or claims will be affected by the forthcoming adjudication in Surrogate's Court, then a stay would be unwarranted.

The final aspect of defendants' abstention arguments concerns Count VII, the fraud claim, which we have also characterized as possibly constituting as well a breach-of-contract claim. Defendants urge dismissal as a matter of comity, because the claim -- however characterized -- concerns only the asserted non-compliance by BNY with the Hong Kong consent orders. According to defendants, a comity-based dismissal is warranted because the Hong Kong courts have continuing jurisdiction over their own orders. (Defs.' Mem. at 24-25).

We reject this argument. As noted, the bank's actions in accounting for plaintiff's cost obligations were already the subject of adjudication in New York State Supreme Court, which

found that plaintiff had failed to demonstrate any injury from the claimed conduct of the bank. Apart from conclusively barring plaintiff's claims in this case, that ruling illustrates that there is no reason to defer to the Hong Kong courts on a claim that, whether treated as sounding in fraud or in contract-breach, is premised on a purported contract between plaintiff and BNY rather than on the court orders that embodied the agreement.[39]

IV. Plaintiff's Motion to Amend

Plaintiff has moved to amend her amended complaint, asserting that she wishes to include the documents that she now proffers in her memorandum of law as exhibits to her complaint. (Pl.'s Mem. at 23). For the reasons briefly outlined here we deny that motion.

Rule 15(a) of the Federal Rules of Civil Procedure commands that motions to amend are generally to be liberally granted, a principle reinforced by the Supreme Court and lower federal courts. See, e.g., Foman v. Davis, 371 U.S. 178, 182 (1962); Jin v. Metro.

---

[39] We note also that the Second Circuit affirmed the dismissal of Count XI, which sought specific performance of the Hong Kong consent orders. See Lefkowitz, 528 F.3d at 107. While that claim might appropriately have been dismissed as a matter of comity, the surviving fraud claim (or its contract-breach variant) does not require involvement of the Hong Kong courts.

Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002). Nonetheless, amendment is properly denied in appropriate circumstances, such as when the proposed amendment would be futile or when the amendment would unduly prejudice another party. See, e.g., Foman, 371 U.S. at 182; Koehler v. Bank of Berm. (N.Y.), Ltd., 209 F.3d 130, 138 (2d Cir. 2000), amended by 229 F.3d 424 (2d Cir. 2000).

In this case defendants oppose the motion to amend, contending that the relief that plaintiff seeks would be futile. (Defs.' Reply Mem. at 9-10). We agree.

Futility generally turns on whether the amending party can at least plead a viable claim. Thus, the analysis appropriate to an assertion of futility is typically whether the proposed new pleading could survive a Rule 12(b)(6) motion. See e.g., Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002); S.S. Silberblatt, Inc. v. East Harlem Pilot Block- Bldg. 1 Hous. Dev. Fund Co., 608 F.2d 28, 42 (2d Cir. 1979) (noting leave should be granted to plaintiff with "at least colorable grounds for relief"); Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP, 994 F. Supp. 202, 205-06 (S.D.N.Y. 1998) (collecting cases).

For reasons discussed at length above, the current amended

112

complaint -- or what remains of it -- fails to state a viable claim. Other than referring to the documents annexed to her memorandum, plaintiff does not specify any amendments that she would seek to make to cure the evident legal deficiencies in her current pleading, much less proffer a proposed second amended complaint. Moreover, it is obvious that the addition of these documents as exhibits to the complaint in its current form would not save any of her claims. Indeed, in our Rule 12(c) analysis we took those documents into account in assessing the viability of the four surviving claims and concluded that those claims still were legally deficient.

In short, plaintiff fails to demonstrate any basis for concluding that allowing her to make still another set of amendments to her complaint would salvage any of her claims. Necessarily, then, her motion must be denied as futile. See, e.g., Horoshko v. Citibank, N.A., 373 F.3d 248, 249 (2d Cir. 2004)("[A]n amendment is not warranted '[a]bsent some indication as to what appellants might add to their complaint in order to make it viable.'")(quoting Nat'l Union of Hosp. & Health Care Employees v. Carey, 557 F.2d 278, 282 (2d Cir. 1977)).[40]

---

[40] We note also that plaintiff fails to proffer a proposed second amended pleading, an omission indicative of the absence of

V. <u>Plaintiff's Request for Judgement on Count VII</u>

In plaintiff's opposition papers, she boldly seeks entry of judgment, apparently on the pleadings, on Count VII and possibly on the fiduciary-breach claims as well. (Pl.'s Mem. at 23). The premise for this application is her contention that the Second Circuit, in adjudicating her appeal from the prior dismissal of the complaint, in effect found facts that trigger liability on the part of the defendants. This argument is truly frivolous.

Plaintiff targets the observation by the Second Circuit -- as she characterizes it -- that BNY did not account for her Hong Kong cost obligation in a manner consistent with the Hong Kong consent orders. (<u>Id.</u> at 9). From this statement she appears to infer that the Court of Appeals has held as a matter of fact that BNY was guilty of either fraud or breach of contract. This argument is completely baseless.

The Second Circuit was called upon to determine, and did

---

any substance to her amendment request. We further observe that plaintiff has certainly been on notice that she cannot simply ask, in open-ended and unspecific terms, for leave to correct any part of a complaint found defective. (<u>See</u> Streng Aff., Ex. 18 – attaching <u>Lefkowitz v. Applebaum</u>, Index No. 4857/96, Decision at 24 (denying a similar motion to amend by plaintiff)).

determine, only whether the probate exception to diversity jurisdiction applied to all or some or none of the plaintiff's claims as pled. The statement that plaintiff cites from the opinion is simply describing the allegations of Count XI, pertaining to the Hong Kong consent orders, so that the Court may determine whether that claim fits within the scope of the probate exception. The Court of Appeals made no factual findings -- indeed, it was not in a position to do so in ruling on a Rule 12(c) dismissal motion -- and its holding offers no basis for us to make findings at this stage, in the context of motions for judgment on the pleadings, that would uphold any of the plaintiff's claims on the merits.

Finally, we note that, for reasons already discussed, plaintiff's current claims are legally defective, and indeed the claim in Count VII for either fraud or breach of contract is plainly barred by virtue of the 2009 finding of the Westchester County probate court that plaintiff failed to demonstrate any injury as a result of the asserted deviation by the bank from the formula allegedly agreed to by BNY to satisfy plaintiff's cost obligation to the estates.

Plaintiff also asserts in conclusory fashion that "other recent decisions" support her entitlement to judgment on the

115

pleadings on her fiduciary-breach claims. (Pl.'s Mem. at 23). Plaintiff does not specify the decisions to which she refers, and thus her request is baseless. We also note that the more likely impact of any recent decisions rendered with respect to plaintiffs' parents' estates would be to bar her current claims, not demonstrate their merit.

In short, plaintiff's motion for judgment on the pleadings should be denied.

VI. <u>Sua Sponte Proposal for an Injunction</u>

The Second Circuit has long recognized the authority of the federal courts to control the behavior of litigants who have "a history of filing 'vexatious, harassing or duplicative lawsuits'" through "restrictions on future access to the judicial system." <u>Mai Sa v. Doe</u>, 406 F.3d 155, 158 (2d Cir. 2005) (quoting <u>Iwachiw v. N.Y. State Dep't of Motor Vehicles</u>, 396 F.3d 525, 528 (2d Cir. 2005); <u>Safir v. United States Lines, Inc.</u>, 792 F.2d 19, 24 (2d Cir. 1986)). <u>See</u> <u>In re Martin-Trigona</u>, 9 F.3d 226, 228-29 (2d Cir. 1993). In this case we cannot say that plaintiff has been a serial

litigator in federal court,[41] but her extraordinary history as a frivolous litigant in state court (if not also in Hong Kong), accompanied by her effort to recycle in this court many of the same claims that she has asserted not only in probate court but also in numerous separate lawsuits in New York State Supreme Court, warrant consideration of such a measure.

In particular, we note that plaintiff's history of pursuing multiple litigations on the same topics and against the same parties in various courts -- including the New York and Westchester County Surrogate's Courts and the New York State Supreme Court both in New York and in Westchester Counties -- has led not only to the rejection of almost al of her claims and the repeated imposition of monetary sanctions on her, but also to the entry of an injunction against her by the State Supreme Court barring such further satellite litigation against specified defendants absent prior court approval, and that injunctive order has been affirmed by the Appellate Division. That order appears well-merited and raises a serious question as to whether a similar order should be entered

_____

[41] As noted, Ms. Lefkowitz filed an earlier suit that ended up in this court, claiming a share in her deceased father's pension. Although she did not prevail, that suit represented at least a _bona_ _fide_ effort to pursue an arguably colorable theory for a claim that arose under federal law.

here in the event of a dismissal of what remains of plaintiff's current complaint.

We view such an order as appropriate, notwithstanding the fact that this is the only federal lawsuit filed by plaintiff in which she pursues many of the same claims as she has aired in state court. In assessing the prejudice that a litigator of this type imposes both on her adversaries and on the courts, we cannot ignore the entirety of her litigation history, which is striking and -- viewed in its entirety -- ample to warrant injunctive relief. Moreover, the fact that the state courts have deemed it necessary to impose such a restriction on Ms. Lefkowitz only further underscores the propriety of our issuing a similar directive. Indeed, were we not to do so, the federal courts would be readily available to plaintiff to evade the state court injunction, which extends only to state-court litigation.[42] Since the state injunction is amply merited, it is deserving of our respect and enforcement, not only as a matter of comity, but also on the basis that the facts that justified the original order speak strongly to the

---

[42] Since plaintiff is a domiciliary of California (Am. Compl. ¶ 1), it appears open to her to pursue diversity litigation in federal court against her favorite defendants.

propriety of our taking a similar position.[43]

CONCLUSION

For the reasons stated, we recommend that defendants' motion to dismiss the balance of the amended complaint (comprising Counts IV, V, VII and VIII) be granted, that the dismissal be with prejudice, that plaintiff's motions for judgment on the pleadings be denied, and that the court enter an order enjoining plaintiff from filing any further lawsuits in this court that pertain to the administration of the estates of her parents or to the conduct of the defendants in administering those estates without prior written permission of this court, which is not to be granted without the prior submission to it of a proposed complaint by plaintiff. Finally, we deny plaintiff's motions to strike portions of defendants' motion papers and to amend the amended complaint.

---

[43] We decline to _sua_ _sponte_ address the imposition of sanctions on plaintiff or the reimbursement of defendants' attorneys fees. We note that in the accounting proceeding for the Irene Marsh estate Surrogate Scarpino denied BNY's request for reimbursement of one-half of its legal fees in defending itself in this action but did so without prejudice to the renewal of that request upon completion of this action.  (Pl.'s Sept. 15, 2009 letter -- attaching In re Estate of Irene B. Marsh, Apr. 16, 2009 Decision at 44-45).

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Victor Marrero, Room 660, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 470 U.S. 140, 150-52 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**Dated: New York, New York**
   **November 25, 2009**

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

120

Copies of the foregoing Report and Recommendation have been mailed this date to:

Ms. Adrienne Marsh Lefkowitz
323 S. Doheny Drive
#207
Los Angeles, CA 90048

Frank Streng, Esq.
Robert M. Redis, Jr., Esq.
McCarthy Fingar L.L.P.
11 Martine Avenue
12th Floor
White Plains, NY 10606-1934